[No. 29136. *En Banc.* April 20, 1944.]

LOUIS J. SPATH et al., *Respondents*, v. ADOLPH M. LARSEN et al., *Appellants.*[1]

*Wm. J. Conniff*, for appellants.

*Max Church*, for respondents.

*The Attorney General, John Spiller, Assistant, Skeel, McKelvy, Henke, Evenson & Uhlmann*, and *Altha Perry Curry, amici curiae.*

[1]Reported in 148 P. (2d) 834.

Beals, J.—Plaintiffs, Louis J. and Laura B. Spath, are the owners of government lot 3, section 27, township 30 north, range 3 W. W. M., and defendants, Adolph M. and Cynthia Larsen, are the owners of government lot 4 (less the south 150 feet), in the same section, which lies immediately south of lot 3. These government lots are on the west side of Sequim bay, and, as to the southerly portion of lot 3 and all of lot 4, border with a concave shore line on a smaller bay, or indentation in the shore line, all as shown on the plat made a part of this opinion.

In this opinion, when we refer to the meander line defining the easterly boundary of lot 3 as a portion of a cove or bay, we intend the southerly portion of lot 3, that being the part of that tract relevant to the facts of this case.

May 22, 1906, plaintiffs' grantor acquired title to the tidelands adjacent to lot 3 by deed from the state of Washington, conveying the following description:

"All tide lands of the second class, owned by the state of Washington, situated in front of, adjacent to and abutting upon lots 1, 2 and 3, section 27, township 30 north, range 3 West W. M."

The deed also contains a description of the government meander line, the description terminating on the south at the point where the meander line crosses the southerly boundary of lot 3. The state's grantee in the deed referred to conveyed the tidelands to plaintiffs by the following description:

"Government lot three (3) of section twenty-seven (27) in township thirty (30) north of range three (3) west of the Willamette Meridian, together with the tide lands of the second class extending to extreme low tide lying in front of, adjacent to and abutting upon said government lot three (3) . . . "

In 1930, defendants entered into a contract with the state of Washington for the purchase of the second-class tidelands situated in front of that portion of lot 4 above described, and on January 28, 1937, received from the state a deed conveying to them

"All tide lands of the second class, owned by the state of Washington, situate in front of, adjacent to or abutting upon lot 4, except the south 150 feet thereof, section 27, township 30 north, range 3 west, W. M., . . . "

Neither of these tideland descriptions purported to define the lateral boundary between the two parcels of tidelands conveyed. As the government meander line defining the easterly boundaries of lots 3 and 4 is concave, presenting a decided curve, it is apparent that the fixing of the boundary line between the two parcels of tidelands cannot be determined by the simple method employed when the shore line is straight, by erecting a line across the tidelands perpendicular to the meander line.

Both lots 3 and 4 were conveyed to the predecessors in interest of the parties to this action while Washington was a territory, and consequently the uplands extend easterly either to the government meander line or the line of ordinary high tide as the same existed at the date Washington was admitted as a state, whichever line was then the farthest out. This matter is not important here; the meander line is accepted by all parties.

September 30, 1942, plaintiffs instituted this action, alleging that they were the owners in fee simple and in possession of "those certain tide lands of the second class, lying and being in front of government lots 3 (and 4, if it so be) in section 27, township 30, north, range 3 west," particularly describing the tidelands as

"Beginning at the intersection of the south line of government lot 3, aforesaid, with the government meander line; thence in a southeasterly direction along a line running on a right angle to said government meander line to the extreme low water line;"

thence in a general northeasterly, etc., direction, following the line of extreme low water to a point where the north line of government lot 3 produced easterly intersects the low water line. The description is then closed by metes and bounds, with which we are not concerned. Plaintiffs then excepted from the foregoing tract of tidelands a tract on the northerly side thereof.

Plaintiffs then alleged that for more than ten years prior to the institution of the action they and their predecessors were in the open, notorious, and exclusive possession of the tidelands referred to, under claim and color of title made in good faith and adverse to all the world, and that during the period mentioned no other person had asserted any title or interest in or to the tract described, or any portion thereof. It was also alleged in the complaint that defendants asserted some claim to the tidelands described, or a portion thereof, which claim was adverse to plaintiffs and was without right, and prayed for a judgment quieting plaintiffs' title to the tidelands described.

Thereafter, on stipulation of the parties, an order was entered providing for an amendment to paragraph 4 of plaintiffs' complaint, the amendment not affecting the questions here presented.

Defendants answered plaintiffs' complaint, admitting that they claimed an interest in the tidelands described in the complaint, and, by way of an affirmative defense, alleged that they were the owners in fee simple of all second-class tidelands adjacent to or abutting upon that portion of government lot 4 above described, and that the northerly boundary line of this tract of tidelands had been indicated, marked, and established in good faith for more than ten years by a line of stakes driven into the ground on the tidelands, and that, for more than ten years past, defendants had been in the open, notorious, and exclusive possession of the tidelands up to the line of stakes.

For a second affirmative defense, defendants alleged that they were the owners of the tidelands abutting upon lot 4, that plaintiffs had only recently acquired government lot 3, and that plaintiffs' predecessors in interest had for many years, and within ten years next preceding the institution of plaintiffs' action, acquiesced in the boundary line between the tracts of tidelands adjacent to lot 4 and those adjacent to lot 3, as established by the line of stakes and as claimed by defendants.

Defendants also pleaded title by adverse possession to the

tidelands up to the line of stakes, and by way of a cross-complaint sought to quiet their title against plaintiffs, asking in the alternative that the court appoint commissioners to establish, by survey, the true boundary separating the tidelands owned by plaintiffs from those owned by defendants.

Plaintiffs having replied to the affirmative defenses and cross-complaint with denials, the action was tried to the court, and resulted in the entry of findings of fact and conclusions of law in favor of plaintiffs. The court found that plaintiffs were the owners in fee simple (subject, of course, to the paramount rights of the state of Washington) of the tidelands abutting upon lot 3, and that the southerly boundary of plaintiffs' tidelands was a line

"Beginning at the intersection of the south line of government lot 3, aforesaid, with the government meander line; thence in a southeasterly direction along a line to the extreme low water line;"

thence in a generally northeasterly, etc., direction, the description then following that set forth in plaintiffs' complaint.

Finding No. 3 entered by the court reads as follows:

"That the point where the meander line in front of the said government lot 3 intersects the south boundary of the said lot 3 is on a cove or indentation bearing away sharply in a generally westerly and southwesterly direction, as indicated upon the maps and plats which were offered and admitted in evidence; that if the boundary of the uplands common to lots 3 and 4 were produced to the line of extreme low tide, the plaintiffs would be cut off from and deprived of access to their uplands and a portion of their tidelands lying north of such a line; that the general and acceptable rule for defining and fixing the side boundaries between the abutting owners of tidelands is to run the line at right angles to the general course of the shore as that course is defined by the meander line; that where the uplands are patented before statehood the boundary between the tidelands and the upland ownership is the line of ordinary high tide or the government meander line which ever line is farthest out toward navigable water, as that point existed at the time of statehood, November 11, 1889; that

the meander line, where the same crosses the upland boundary common to government lots 3 and 4, is now and was on November 11, 1889, when Washington was erected into statehood, farther out toward the line of navigable water; that the state of Washington acting through the office of the state land commissioner and the state land board has ever since the creation of the said office and board employed the method hereinabove immediately indicated for the determination of the side boundaries of tidelands of the second class, which is the application of the rule which seems to be generally accepted and applied in all jurisdictions; that at the point where the government meander line intersects the boundary line common to lots 3 and 4 (being the south boundary of lot 3) the said government meander line has a bearing of south 53 degrees west and that the said boundary line between the tidelands of the second class in front of lots 3 and 4 should be defined by a line erected perpendicularly to the said meander line at that point, that is to say, by a line running south 37 degrees east from the said meander line to the line of extreme low tide, which line is the first course set forth in the description of the real property belonging to the plaintiffs as the same is described in their complaint and in these findings of fact."

The court also found that plaintiffs and their predecessors in interest had been in possession of the tidelands described for more than ten years, and

"(5) That it is not true that the defendants, or either of them, by themselves, severally or individually or otherwise, are in the actual, notorious or exclusive possession, holding under claim, color or muniment of title made in good faith and adversely to all the world or at all or otherwise, to any portion of the real property hereinabove described and set forth in the complaint; nor is it true that the northerly boundary of the tidelands of the second class lying in front of lot 4 in section 27 has been for more than ten years or at all, nor is it now, marked or established by a line of staves or posts driven into the ground on said tidelands.

"(6) That it is not true that the defendants have ever been in the open or notorious or exclusive possession, holding under color of title or otherwise, or at all, of any part of the tidelands lying in front of government lot 3 and embraced within the description thereof set forth in plaintiffs' complaint and determined by the method herein set forth, and particularly lying northerly of the line running south

37 degrees east from the intersection of the meander line in front of section 27 and the boundary common to lots 3 and 4 of said section."

After denial of defendants' motion for a new trial, the court entered judgment in plaintiffs' favor, quieting their title to the tidelands as described in the findings. From this judgment, defendants have appealed.

Error is assigned upon the denial of appellants' motion to dismiss the action at the close of respondents' case; upon the refusal of the trial court to grant appellants' motion for a new trial; upon the entry of five findings of fact; upon the court's adjudication that the boundary line between the two tracts of tidelands is a line drawn perpendicular to the meander line at the point of intersection with the meander line of the boundary line between lots 3 and 4.

Appellants also assign error upon the judgment quieting title to the tidelands in respondents' favor; upon the court's ruling as to the quantum of proof required of appellants in introducing evidence under their cross-complaint claiming title by adverse possession; upon that portion of the decree quieting respondents' title to the tidelands northerly of the boundary line established by the court, above referred to; and upon the refusal of the trial court to order a survey made to establish this boundary line, as demanded by appellants.

Appellants complain of the trial court's finding that title to the tidelands up to a certain lateral boundary (which they alleged was marked on the ground by a line of stakes) is not vested in them by adverse possession. While from examination of the record our evaluation of the evidence might differ from that of the trial court, it cannot be said that the evidence preponderates against the finding. We accordingly decline to set aside the court's ruling upon the issue referred to.

The main question presented involves the court's establishment of the southerly boundary line of respondents' tidelands, which is, of course, the northerly boundary line of the tidelands owned by appellants. The court fixed this

boundary by erecting a perpendicular to the government meander line at the point of intersection of the meander line with the south boundary line of government lot 3.

In order that the questions hereinafter discussed may be more easily understood, we make a part of this opinion a plat showing the uplands owned by the respective parties and portions of the tidelands adjacent thereto, the boundary line as adjudicated by the trial court being shown by a broken line.

Curiously enough, the question of the determination of lateral boundaries between different tracts of tidelands located upon a bay or a concave shore line is now presented to this court for the first time. As in this state, with its miles of tidewater shore line, the question is of considerable importance, we have endeavored to establish certain rules which may serve as guides in similar cases, always bearing in mind, however, that we have before us for determination a specific problem, and that rules applicable to the situation here presented may not apply in all cases.

As a general proposition, one of the basic rights enjoyed by owners of adjoining tidelands is the right of access to open water at the line of low tide. The value of this element of the ownership of tidelands varies, of course, with each individual situation. In some instances it may be the chief element of value of tidelands; in other cases its importance may be insignificant; but, generally speaking, the right of the owner of tidelands to enjoy access to deep water is an important consideration.

The particular question here presented, though new to this jurisdiction, is old in American law, having apparently first arisen in the course of the interpretation of the 1641 ordinance of the colony of Massachusetts, Body of Liberties, article 16, as amended in 1647, 28 Massachusetts Historical Collections, p. 219; Massachusetts Colonial Laws (ed. 1660), p. 50; ed. 1672, pp. 90-1. The pertinent portion of the ordinance, title "Liberties Common," § 2, reads in part as follows:

"Every Inhabitant who is an housholder shall have free fishing and fowling in any great ponds, bayes Coves and

Rivers, so farr as the Sea ebbs and flowes, within the pre-
cincts of the towne where they dwell, unless the freemen
of the same Town or the General Court have otherwise ap-
propriated them. Provided that no Town shall appropriate
to any particular person or persons, any great Pond contain-
ing more than ten acres of land, and that no man shall come
upon anothers propriety without their leave otherwise then
as hereafter expressed. The which clearly to determine,
It is Declared, That in all *Creeks, Coves* and other places,
about and upon *Salt-water*, where the Sea ebbs and flowes,
the proprietor of the land adjoyning, shall have propriety
to the low-water-mark, where the Sea doth not ebb above
a hundred Rods, and not more wheresoever it ebbs further.
Provided that such proprietor shall not by this liberty, have
power to stop or hinder the passage of boates or other ves-
sels, in or through any Sea, Creeks or Coves, to other mens
houses or lands."

The foregoing is quoted from the facsimile reproduction
of "The Book of the General Laws and Liberties, etc., of
Massachusetts," printed at Cambridge, by order of the
General Court, 1660, as found in the Colonial Laws of Mas-
sachusetts, published by order of the city council of Boston,
1889, at p. 170.

The same ordinance is found in the Colonial Laws of
Massachusetts, reprinted from the edition of 1672, pub-
lished by order of the city council of Boston, 1890, pp. 90-91.

The portion above quoted is also set forth in the note
to the case of *Commonwealth v. Roxbury*, 9 Gray (75 Mass.)
451, at p. 465. After quoting the foregoing portion of the
ordinance and further discussion of authorities, the author
of the note continued (p. 521) as follows:

"The difficulty of applying the rule of the ordinance to
the conflicting claims of coterminous proprietors was per-
ceived very early. In 1683 the following question was pre-
sented (by whom does not appear) to the general court: 'In
regard the law entituled Libertys common doth give to all
that border upon highwater mark the flats lying before
their land downe to low water mark. Hence Query. When
severall proprietors have land bordering upon a cove which
is more than a semicircle. Q. Whether a line from the cir-
cumference to the center of the semicircle ought not be the
bounds to each mans propriety, and not low water mark.'

By a plan annexed the question would appear to have arisen in Braintree. The magistrates thereupon on the 17th of May 1683 passed the following act, which however was not consented to by the deputies: 'For further explanation of the law granting to all proprietors of lands butting upon the salt water interest in the flatts to low water mark. Resolved upon the question, That where lands are so circumstanced as that to continue their bounds on strait lines to the lower water mark would unavoidably interfere one with another, the flats adjacent to low water mark shall be divided in proportion to each proprietors breadth upon high water mark: Provided alwayes this act of the court shall not be construed to disturb any orderly settlement formerly made.' 47 Mass. Archives, 54."

In the case of *Rust v. Boston Mill Corp.*, 6 Pick. (23 Mass.) 158, the supreme judicial court of Massachusetts was called upon to adjudicate a controversy between two claimants to tidelands bordering on a cove, and the court's decision has been frequently considered and often followed in determining similar questions. In the course of the opinion, Justice Wilde, speaking for the court, said:

"And it appears to me that the supposed difficulty of making a division of the cove among the several proprietors of the land adjoining, is without foundation. Let us suppose that a line drawn across the mouth of the cove were 100 rods in length; and that the circular line of the cove at high-water mark were 200 rods in length. Then each proprietor of a lot abutting on the cove would be entitled to run his lines from the two corners of his lot in a direction to low-water mark, so as to include a piece of flats which would be at the mouth of the cove one half of the width of the lot at high-water mark; and thus by converging lines the whole cove might be divided without any intersecting lines.

"Thus if there were only two proprietors of the land surrounding the cove, each holding a moiety in severalty, and their dividing line being at the centre of the head of the cove; then a central line passing down to low-water mark would be the dividing line of the flats between the two proprietors. So if there were four proprietors, each owning an equal extent of front on the cove, then each would be entitled to a piece of flats 25 rods in width at the mouth of the cove, so that lines drawn from the corners of each lot at the front, in a direction to low-water mark, and being

distant from each other at the mouth of the cove 25 rods, would give to each proprietor his due share of the flats in the cove, according to the terms of the ordinance of 1641. And this form of division will be practicable whatever may be the number of lots around the cove. Thus each proprietor may hold his share of the flats in severalty, subject to no other restrictions than those imposed by the ordinance . . . In thus dividing flats in a cove or creek, we suppose that there is no natural channel within the cove, and that low-water mark is without the same."

The ordinance of the colony of Massachusetts Bay, as adopted in 1647, became a portion of the common law of the state of Maine, and in 1832 the supreme court of that state, in the case of *Emerson v. Taylor,* 9 Green. (9 Me.) 42, 23 Am. Dec. 531, had occasion to interpret the ordinance, and, in so doing, established what has since been known as the Maine rule. The court apportioned the tidelands in the following manner:

"Draw a base line from the two corners of each lot, where they strike the shore; and from those two corners, extend parallel lines to low-water-mark, at right angles with the base line. If the line of the shore be straight, as in the case before us, there will be no interference in running the parallel lines. If the flats lie in a cove, of a regular or irregular curvature, there will be an interference in running such lines, and the loss occasioned by it must be equally borne or gain enjoyed equally by the contiguous owners."

The supreme court of Maine followed and applied this rule in the cases of *Call v. Carroll,* 40 Me. 31, and *Portsmouth Harbor etc. Co. v. Swift,* 109 Me. 17, 82 Atl. 542.

The Maine rule has not often been followed in other jurisdictions, and was expressly repudiated by the supreme court of Massachusetts in the case of *Gray v. Deluce,* 5 Cush. (59 Mass.) 9, as being entirely inapplicable to the situation then presented to the court. In the case last cited, the tidelands, or "flats," were located along a shallow cove, the arc of which was less than a semicircle. After observing that it had been the intention of the colonial legislative authority in enacting the ordinance above quoted to give to every upland proprietor a proportion of the flats border-

ing on his upland equal in width with his upland at high water mark, the court observed that such an apportionment was impossible in cases where the lands were situated on a cove, on a bay, or on a headland, and in the case cited, apportioned the tidelands as follows:

"The division is to be made by running a base line across the mouth of the cove, and the whole flats within the cove are to be divided among the proprietors, by parallel lines, *at right angles with the base line.*" (Italics ours.)

A plat printed in the reported case precludes misinterpretation of the court's opinion.

It is manifest that, due to the endless variety of shore line configurations, no one formula for determining the lateral boundaries of tidelands will be applicable to all cases. *Stark v. Meriwether*, 98 Kan. 10, 157 Pac. 438. Along a comparatively straight shore line, these boundaries may easily be determined by erecting lines perpendicular to the shore or meander line, depending upon which line constitutes the water boundary of the upland, at points where property side lines intersect the shore or meander line. *Knight v. Wilder*, 2 Cush. (56 Mass.) 199, 48 Am. Dec. 660. Questions of the greatest difficulty are presented by the variety of coves, bays, capes, and promontories which are found in the shores of the ocean, and with unusual variety in the islands and shores of Puget sound.

In the case of *Wonson v. Wonson*, 14 Allen (96 Mass.) 71, Justice Gray generalizes as follows:

"The leading rules thus established may be reduced to three. First, the dividing lines are generally to be drawn in the most direct course from high water mark towards low water mark. Second, wherever it is practicable, each proprietor is entitled to the flats in front of his upland of the same width at low water mark as at high water mark. Third, which is perhaps the fundamental rule, underlying and controlling all others, the flats are to be so divided as to give each parcel a width at its outer or seaward end proportional to that which it has at high water mark.

"Where the general course of the shore approximates to a straight line, a compliance with all these rules is readily attained by drawing a straight line according to the general

course of the shore at high water mark, and extending the side lines of all the estates at right angles with it towards low water mark.

"The diversity and irregularity in the form of the seashore often increase the difficulty of a just division, and make a universal adherence to all these rules impossible. Where, for instance, the general course of the shore line is much curved, either outwardly, as around a headland, or inwardly, as in a cove, the parcel of flats belonging to each estate cannot be of equal width throughout, but must expand or contract, accordingly as the outer line of the flats is longer or shorter than the line at high water mark. Around a headland, where the line is longer at low water mark than at high water mark, where each proprietor can have direct access to the sea without interfering with his neighbors, and the only question is of the distribution of the increase in the width of the flats, disputes rarely arise.

"The most frequent and the most embarrassing questions concern the division of flats in coves, bays, or inlets, in which the form of the shore, while it affords a shelter for vessels and thus increases the value of the flats, makes it impossible to define each estate by parallel lines from the upland towards low water mark, without encroaching upon other estates; and it is often difficult to make such a division as will give each proprietor access to low water mark, to which all are equally entitled. This difficulty is peculiarly felt when the title to the flats is tried in the ordinary form of a real action between two parties only, with no means of bringing all the proprietors of different tracts of flats in the same cove before the court in one suit, whereby all may be heard before the lines of any one are established." (Citations omitted.)

The case involved lands situated on two coves, the low water mark being outside the mouths of both. Justice Gray summed up the situation as follows:

"The natural monuments indicating the boundaries of the cove are the headlands on either side. As the flats belonging to part of the upland which lies within the headlands extend to low water mark outside of a base line drawn across the mouth of the cove from headland to headland at ordinary high water, it is plain that the division cannot be confined to the flats within that base line; and we agree with the commissioners that the rule adopted by them, for as-

certaining what flats outside as well as inside of that line are to be treated as within the boundaries of the cove, is substantially accurate, and of more easy practical application than any other. The simple and natural way of ascertaining what flats outside of the base line are to be considered as belonging to, and to be divided among, the estates within the cove, is to draw side lines at each end of the base line and at right angles with it to low water mark. The commissioners fixed the side line at the northerly headland in this manner, there being nothing in the form of the adjoining shore to require a variation in it. But at the southerly headland it appeared that the side line of this cove, if so drawn, would conflict with the side line, drawn on like principles, of the cove next adjoining; and as the line dividing the two coves could not therefore be extended at right angles to the base lines of both, it was properly projected at an equal angle to each base line, so as to distribute equally between the two coves the angle of flats which would be included between the lines drawn from that headland to low water mark at right angles to the base lines of the two coves respectively. An analogous rule has been adopted in Maine for the division of flats between adjoining estates. The objections which have prevented this court from applying such a rule to private estates, the boundaries of which depend upon the acts of man and are therefore changeable and often artificial, do not hold good as between two coves or other sections of the shore, the bounds and monuments of which are natural and invariable." (Citations omitted.)

The case cited is analyzed in Clark's Surveying and Boundaries (1922 ed.), §§ 306-7.

The Massachusetts cases are summarized in the note to the case of *Commonwealth v. Roxbury,* 9 Gray (75 Mass.) 451, *supra,* at pages 521-2:

"The general rules for the division of flats among coterminous proprietors, so far as they can be ascertained from the adjudged cases, may be thus stated:

"1st. The intention of the ordinance was, 'if practicable, to give to every proprietor the flats in front of his upland, of equal width with his lot at low water mark.' . . .

"3d. The direction of the side lines of the flats is not governed by that of the side lines of the upland. Unless expressly so agreed by the parties.

"4th. Where there is no cove or headland, a straight line is to be drawn according to the general course of the shore at high water, and the side lines of the lots extended at right angles with the shore line.

"5th. Around a headland, the lines dividing the flats must diverge towards low water mark.

"6th. In a shallow cove, in which there is no channel, a base line may be run across the mouth of the cove, and parallel lines drawn, at right angles with the base line, from the ends of the division lines of the upland to low water mark.

"7th. A deep cove, out of which the tide entirely ebbs at low water, is to be divided by drawing a line across its mouth, giving to each proprietor a width upon the base line proportional to the width of his shore line, and then drawing straight converging lines from the divisions at the shore to the corresponding points on the base line." (Citations omitted.)

Among the cases cited by the court in the foregoing quotation is *Attorney General v. Boston Wharf,* 12 Gray (78 Mass.) 553. This case apparently limits somewhat the scope of the case of *Gray v. Deluce, supra,* although later citations of the latter case show that its authority is not impaired when the facts are similar.

In Tyler's Law of Boundaries, Fences and Window Lights (Albany 1876), several of the early cases above referred to are discussed. The text writer commented on these cases as follows (p. 232):

"The cases noted from the 9th Gray arose principally under a local ordinance, and yet they decide principles which may be universal in their application, and they may serve as precedents, or illustrations of many cases in general practice."

The supreme court of Rhode Island, in the case of *Aborn v. Smith,* 12 R. I. 370, in discussing the problem of defining the water fronts of the owners of lands situated on a cove, with respect to a harbor line, said:

"The rule invoked by the complainants is a rule borrowed from a work on the civil law, which was applied by the Supreme Judicial Court of Massachusetts to the apportionment of alluvion in the bend of an innavigable river. The

rule has been approved as a rule for the apportionment of alluvion in New York and in the Supreme Court of the United States. It has also been applied, but not invariably, to the apportionment of tide-flowed flats lying in a cove or littoral recess, among the owners of the upland. In *Gray v. Deluce*, 5 Cush. 9, flats lying in a shallow cove were divided among the owners of the upland by drawing parallel lines from the ends of the division lines of the upland at right angles with a base line across the mouth of the cove. This rule seems to have met with approval in *Stockham v. Browning*, 18 N. J. Eq. 391. In *Atty. Gen. v. Boston Wharf Co.*, 12 Gray, 553, 558, the court say that, 'in general, where there are no circumstances or peculiarities in the formation of the shore or the course of the channel, the lines of division are to be made to the channel in the most direct course from the lateral boundaries of the several tracts of upland to which the flats are appended.' We are not advised that any rule has ever been laid down for a case like the one at bar. . . .

"It follows that the dividing line between the water fronts here, in case the parties have not established one for themselves, is a line drawn from the shore end of the dividing line of the upland to the harbor line so as to intersect it at right angles. This rule is analogous to the rule laid down in *Gray v. Deluce*, and to the rule applied by us in *Thornton v. Grant*, 10 R. I. 477, 487, to the ascertainment of water fronts where no harbor line existed. It has the great recommendation of simplicity of application." (Citations omitted.)

It is easy to understand the difference between the result which would be obtained by establishing a line at right angles with the meander line and a line drawn from the same point on the shore to intersect the harbor line or low water mark at right angles with that line, assuming that the meander line and the line of low water mark are not parallel or that the shore line is concave or convex.

In the recent case of *Mutual Chemical Co. v. Baltimore*, 33 F. Supp. 881, the United States district court summarized the general principle as follows:

"The following general rules for the apportionment of riparian rights are firmly established: If the shore line is straight, the riparian lines are to be extended from the divisional lines on shore into the water, perpendicular to

the shore line. If, on the other hand, the shore line is concave, converging lines shall be run from the divisional shore lines to the line of navigability. *City of Baltimore City v. Steamboat Co.,* 104 Md. 485, 498, 65 A. 353. If the shore lines are convex, the lines will be divergent to the line of navigability. Surveying and Boundaries, by Frank Emerson Clark, Secs. 268, 269. However, it is self-evident that each of these rules cannot be strictly applied where irregular shore lines are involved, if all affected property owners are to be treated equitably. So, modifications have been enunciated in various State Court decisions, notably in *Deerfield v. Arms,* 17 Pick., Mass., 41, 28 Am· Dec· 276; *Gray v. Deluce,* 5 Cush., Mass., 9; *Thornton v. Grant,* 10 R. I. 477, 14 Am. Rep. 701, and *Aborn v. Smith,* 12 R. I. 370."

The court then quoted at length from the opinion of the supreme court of Rhode Island in the *Aborn* case, *supra,* and expressed approval of the principles laid down by the supreme court of Rhode Island.

Respondents in their brief rely upon the opinion of the supreme court of Oregon in the case of *Columbia Land Co. v. Van Dusen Inv. Co.,* 50 Ore. 59, 91 Pac. 469, 11 L. R. A. (N. S.) 287, cited by the United States district court in the *Mutual Chemical Co.* case, *supra.* The Oregon case is not here in point, the court having expressly found that the shore line curve did not warrant treatment of the same as a cove, since the headlands were four miles apart. In the case at bar, there can be no question but that the shore land with which we are concerned is situated on a shallow cove, the headlands being but half a mile, or thereabouts, apart. It should be noted that the Oregon supreme court, in the case relied upon by respondents, said:

"A proper division in all cases is that each shore owner shall have a proportionate share of the deep-water frontage, and the rules adopted by the courts in relation thereto are with that end in view,"

and cited with approval the *Rust* and *Gray* Massachusetts cases, *supra.* The court then quoted from the *Aborn* case, *supra,* including the following:

" 'It follows that the dividing line between the water fronts here, in case the parties have not established one for

themselves, is a line drawn from the shore end of the dividing line of the upland to the harbor line so as to intersect it [the harbor line] at right angles.' "

The Oregon case is in substantial harmony with the *Aborn* and *Mutual Chemical Co.* cases, *supra,* and does not support respondents' argument in the case at bar.

Problems analogous to that here presented have frequently arisen in connection with lands bordering on the Great Lakes, especially that portion of Lake Michigan known as Green Bay. While tidal movement in the waters of Lake Michigan is nonexistent or insignificant, questions concerning shore lands lying between high and low water frequently arise. In the case of *Blodgett & Davis Lbr. Co. v. Peters,* 87 Mich. 498, 49 N. W. 917, 24 Am. St. 175, the supreme court of Michigan applied the Massachusetts rule, with appropriate modifications to suit the particular situation presented. In the course of the opinion, the court said:

"The object to be kept in view in cases of this kind is to secure to each proprietor access to navigable water, and an equal share of the dockage line at navigable water in proportion to his share on the original shoreline of the bay . . . The rule early defined in Massachusetts is —

"1. To measure the whole extent of the ancient bank or line of the cove or bay, and compute how many rods, yards, or feet each riparian owner upon such line has.

"2. To divide the newly-formed line into as many equal portions as those contained in the shoreline, and then draw straight lines from the point at which the proprietors respectively bounded on the old to the points thus determined as the points of division on the newly-formed line.

"It is freely admitted that this rule may require modification under particular circumstances in order to secure equal justice."

The supreme court of Wisconsin, in the case of *Northern Pine-Land Co. v. Bigelow,* 84 Wis. 157, 54 N. W. 496, 21 L. R. A. 776, determining rights to shore lands on Lake Superior, followed the Massachusetts rule. In the case of *Thomas v. Ashland etc. R. Co.,* 122 Wis. 519, 100 N. W. 993, the supreme court of Wisconsin reaffirmed the rule laid down in its opinion last above cited.

In the case of *Seattle Factory Sites Co. v. Saulsberry*, 131 Wash. 95, 229 Pac. 10, in an action to determine boundaries of adjoining tracts of Lake Washington shore lands, this court, by way of dictum, quoted with approval from the *Northern Pine-Land Co.* case, *supra.*

The supreme court of Maryland, in the case of *Baltimore v. Baltimore & P. Steamboat Co.*, 104 Md. 485, 65 Atl. 353, noted the general rule that lateral boundaries between tide and shore lands should be fixed by erecting perpendiculars at right angles to the shore, if the shore line is straight, or, if the shore is concave, by establishing converging lines which proportionately divide the tidewater shore among the abutting owners.

The supreme court of Virginia, in the case of *Lambert's Point Co. v. Norfolk & W. R. Co.*, 113 Va. 270, 74 S. E. 156, used the shore as the base line for the erection of perpendicular lines for shore line boundaries, the lands concerned not being situated on a cove, while in the earlier case of *Groner v. Foster*, 94 Va. 650, 27 S. E. 493, the court, being required to apportion shore lines bordering on a concave shore, applied the rule: "As the whole shore line is to the whole line of navigability, so is each one's share of the shore line to each one's share of the line of navigability."

The New York case of *People v. Schermerhorn*, 19 Barb. 540, cited by respondents, was not concerned with lands with a shore line lying along a cove, but with land which came to a point on the East river. It was held that the defendants were entitled to nothing but a perpendicular line extending into the water.

Among other cases, respondents cite *O'Neal v. Rollinson*, 212 N. C. 83, 192 S. E. 688, in which the supreme court of North Carolina, dealing with a case involving a straight shore line, after quoting from 45 C. J. 495, as follows:

"In 45 C. J. 495, we find this appropriate statement: 'The apportionment of riparian rights as between adjoining riparian owners is made by extending lines from the ends of the side lines at right angles to the line of the water front if the latter be straight or substantially so, subject to variation where the line of navigation is not parallel with the

shore line, without regard to the direction of the dividing lines of the upland parcels,' "

said: "The 'right angle' principle applied to the facts in the instant case appears to be reasonable." The court quoted from the New Jersey case of *Delaware etc. R. Co. v. Hannon,* 37 N. J. L. 276, as follows:

" 'Along that part of the shore embracing the premises in question, the high water line was practically straight, and wherever this is the case, the side lines of the land reclaimed must be at right angles to such base line.' "

The supreme court of Connecticut, in the cases of *Morris v. Beardsley,* 54 Conn. 338, 8 Atl. 139, and *Lane v. Smith Bros.,* 80 Conn. 185, 67 Atl. 558, held that, in determining the ownership of tidelands surrounding a convex shore line, a line should be laid at right angles to the general course of the shore. While this rule is subject to criticism and cannot be applied in all cases, it is generally true that little difficulty arises from its application, since off a *convex* shore the line of low water is longer than the high water line. In case of a concave shore line, the supreme court of Connecticut, in the case of *Rochester v. Barney,* 117 Conn. 462, 169 Atl. 45, said:

"Where the general course of the shore is a broad concave curve, the division is along a perpendicular from the intersection of the upland boundary line between the parties with the high-water mark to a base line drawn across the mouth of the curve."

In the same opinion, the statement quoted is clarified by the following line: "Adoption of a line perpendicular to a base line, drawn across the mouth of the curve, to the upland boundary at high-water mark . . . "

In the case cited, the rule referred to was not applied, because of the unusual situation presented.

In the case of *Manufacturers' Land & Imp. Co. v. Board of Commerce,* 98 N. J. L. 638, 121 Atl. 337, the supreme court of New Jersey was concerned with the establishment of tideland boundaries, the syllabus prepared by the court stating the rule as follows:

"The established rule in relation to side lines of riparian grants . . . that where the water front is practically straight, such side lines are to run at right angles to it, and, if curved, then in such manner as, to divide the foreshore ratably among the littoral owners, is not to be disregarded or modified merely because a riparian owner has seen fit to subdivide his land and sell it in parcels whose side lines do not run down to the shore at right angles thereto."

In Skelton's Boundaries and Adjacent Properties (1930 ed.), p. 338, § 297 (6), is found the following text:

"The side lines of the upland property may be extended if the apportionment is fair, but their direction does not necessarily determine the courses of the side lines over flats or accretions and may be disregarded.

"Where coves exist a base line is taken across the mouth, and if it is not practical to run the side lines over the accretion at right angles to the base, the latter is divided proportionately, and the points of division connected with extremities of the upland lines."

In the recent case of *Iris v. Hingham,* 303 Mass. 401, 22 N. E. (2d) 13, the supreme judicial court of Massachusetts quoted from its earlier opinion in the case of *Wonson v. Wonson, supra,* the court being careful to note that the rules laid down in the earlier case were not applicable "where the physical characteristics of the locus are so peculiar and unusual that the application of these rules would be inequitable." The *Hingham* case, however, embodies no variation from the *Wonson* case. The court held that the land in question should

" . . . be considered in conjunction with all the remaining lots in the vicinity that have adjacent thereto their respective parcels of flats, which together comprise the total area of flats belonging to these upland lots."

For lack of evidence, the court was unable to establish the boundaries of the petitioner's tidelands, and, as a new trial was ordered, the court observed that the petitioner would be afforded an opportunity to supply evidence necessary to enable the court upon a retrial of the action to define petitioner's "flats in accordance with the general principles above mentioned."

The problem of apportioning tidelands or flats is analogous to the apportionments of alluvion. The leading case on the apportionment of accretions between coterminous proprietors of land situated on a cove or bay is *Deerfield v. Arms,* 17 Pick. (34 Mass.) 41, 28 Am. Dec. 276. In the course of its opinion, the court cited the cases of *Rust v. Boston Mill Corp.,* 6 Pick. (23 Mass.) 158, and *Emerson v. Taylor,* 9 Green. (9 Me.) 42. The court also cited "A collection of New Decisions," by Denisart, published in France in 1783. The publication is referred to as in the form of a dictionary, the text applicable to the question under discussion being found under the title "Attérissement."

The *Rust* case was cited by the Massachusetts court in the cases of *Ashby v. Eastern R. Co.,* 5 Met. (46 Mass.) 368, 38 Am. Dec. 426, and *Sparhawk v. Bullard,* 1 Met. (42 Mass.) 95.

The *Deerfield* case was cited with approval in the following cases: *Johnston v. Jones,* 66 U. S. 209, 17 L. Ed. 117; *Swarzwald v. Cooley,* 220 Cal. 438, 31 P. (2d) 381; *Allen v. Wood,* 256 Mass. 343, 152 N. E. 617; *O'Donnell v. Kelsey,* 10 N. Y. 412; *Hamilton v. Horan,* 193 Ark. 85, 97 S. W. (2d) 637; *South Shore Lbr. Co. v. Thompson Lbr. Co.,* 94 Fed. 738; *Newell v. Leathers,* 50 La. Ann. 162, 23 So. 243; *Batchelder v. Keniston,* 51 N. H. 496, 12 Am. Rep. 143; *Todd v. Murdock,* 230 Iowa 1121, 300 N. W. 284.

On the reargument of this case, counsel called to our attention the opinion of the Scottish Court of Session, in the case of Alexander Nimmo and others, Trustees, Pursuers, v. Caledonian R. Co., Defenders, decided June 23, 1903, and reported in Cases Decided in the Court of Session, etc., published by T. & T. Clark, 1903, 5th series, vol. 5, p. 1001. The problem before the Scottish court was the apportionment of tidelands along the shores of the Firth of Forth. The area in question lay along the bend of the estuary, the *medium filum* describing a fairly wide arc. In deciding the question, the court followed the apportionment theory, reaching its result by a rather complicated mathematical formula.

Interesting texts referring to apportionment of tide or

shore lands are found in the following authorities: Tiffany on Real Property (3d ed.), vol. 2, p. 727, § 669; Thompson on Real Property (Perm. ed.), vol. 6, § 3434; Black's Pomeroy on Water Rights (1893 ed.), p. 552, § 255.

We have discussed the authorities at considerable length, because, as far as we are advised, the question here presented is a new one in this jurisdiction, and is undoubtedly a matter of considerable importance to many persons.

In the case of *Seattle Factory Sites Co. v. Saulsberry,* *supra,* the principal question presented was the right of the court to bring in the owners of adjoining properties as parties to a dispute concerning the lateral boundaries of shore lands lying in a cove or bay on Lake Washington. The court held that the

" . . . admitted allegations of the complaint necessarily incidentally draw in question each and every boundary line dividing all of the tracts of shore land; that a proper determination of one necessarily calls for the determination of all others; and hence that it was proper to bring in the owners of all the tracts as parties to the action, to the end that the decree ultimately to be rendered should become effective as against all such owners."

Of course, no private *ownership* may extend beyond the line of low tide.

In the case at bar, the record does not disclose either the lines of high or mean high tide, or the lines of low or mean low tide. There was introduced in evidence a print of the United States coast and geodetic survey of Sequim bay and of Port Discovery, but the purpose of the introduction of the exhibit is not disclosed by the record. No witness testified concerning the location of the line of low water, and while from some photographs which are in the record it might be inferred that there is no very great distance between the lines of high and low water, the record contains no data from which the location of the latter line can even be estimated.

Neither does the record contain evidence concerning the location of the line of high water. It is possible that, at some places along the shore of the uplands with which we are

here concerned, this line may be beyond the meander line, and that the upland ownership may extend beyond that line. The parties, however, apparently tried the case upon the theory that the government meander line should be taken as the boundary of the parcels of upland owned respectively by the parties to this action.

In the case at bar, we are concerned merely with the establishment of one boundary line, that which divides the tidelands owned by the respective parties to this action. We are not concerned with the northerly limits of respondents' tidelands, nor with the southerly boundary of those belonging to appellants. However, in deciding the question presented, we have endeavored to lay down certain general principles to be followed when the facts of any particular situation warrant such application. It must always be remembered, however, that the endless variations of shore lines within this state will present many questions concerning the ownership of tidelands, which cannot be determined by any one fixed rule, however elastic.

Taking the Massachusetts rule as our basic guide, we state the following general principles from which the disputed boundary line in the case at bar may be determined:

*First:* In adjudicating the ownerships of tidelands between adjoining upland owners on a concave shore line, each upland owner is entitled to a proportionate share of the tidelands extending to the low water mark.

*Second:* The course or courses of the boundaries of the upland properties should be disregarded, each upland owner being entitled to share ratably in the adjoining tidelands, having regard only to the amount of shore line which he owns, lying between the points where the lateral boundaries of his upland meet the shore line or the government meander line, whichever, in the particular case, constitutes the water boundary of his upland.

*Third:* Tidelands should be apportioned between the respective upland owners so that, as the whole length of the water boundary of the land within the concave shore, cove, or bay, is to the whole length of the low water line,

so is each landowner's proportion of the shore line to each owner's share of tidelands along the line of low water. Tidelands may be divided between adjoining owners by erecting lines perpendicular to the general course of shore line only in cases where the shore line is straight, or substantially so.

In the instant case, it is clear that, if the parties are unable to agree between themselves as to the location of the boundary line between their respective tidelands, that line may be determined only by a survey in accordance with the principles above set forth. Just how extensive a survey may be required cannot be determined from the record before us.

▇ The expense of such a survey is immaterial. If the parties cannot agree as to their rights, the courts can only announce the correct rule, regardless of the cost of applying such a rule.

In the case of *Snell v. Stelling*, 83 Wash. 248, 145 Pac. 466, this court, speaking through Judge Ellis, said:

"Since the action has been reduced in its essence to one to restore a lost or uncertain boundary, we think the case is one peculiarly calling for the appointment of disinterested commissioners to make a complete survey of both tracts upon the ground with a view to establishing the common boundary between the two tracts, if it can be done by a survey following the descriptions, and in any event returning to the court a plat of their survey with their field notes together with their report. The discretion to appoint commissioners for that purpose is clearly given by the statute, Rem. & Bal. Code, § 948, and we think, under the state of the record now before us, that had such an application been made by either party in the court below, a refusal to follow that course would have been an abuse of the discretion."

In the case at bar, appellants requested the appointment of commissioners who should establish the boundary, and upon the record before us it must be held that the trial court erred in failing to grant appellants' application.

In the recent case of *Cady v. Kerr*, 11 Wn. (2d) 1, 118 P. (2d) 182, 137 A. L. R. 713, we said:

"It is unfortunate that the cost of a survey is so great, and it is still more unfortunate that, despite that fact, the parties cannot settle their differences amicably. The expense incident to litigation between individuals, however, is a matter for the individuals themselves to consider as possibly constituting a sufficient reason and incentive for an amicable adjustment, but it cannot afford any sound basis for a refusal by the court to dispose of a controversy before it in the manner provided by law."

The trial court erred in establishing the boundary line along a line erected perpendicular to the government meander line at the point where the meander line meets the common boundary of government lots 3 and 4, all as shown upon the plat which is made a part of this opinion. A glance at that plat shows the impossibility of making any just division of tidelands fronting on a cove, by following the theory adopted by the court.

As shown by the ordinance of the colony of Massachusetts, above quoted, the principle that each upland (or tideland) owner is entitled to reach deep water has always been recognized. It may sometimes happen that the upland on a cove and adjacent tidelands are owned by different persons. If the side boundaries of such tidelands be determined by the method adopted by the trial court, the owner of the tidelands might be cut off from the low water line and deprived of all means of ingress or egress to or from his property. In following the meander (or shore) line of the cove with which we are here concerned, it is evident that perpendiculars erected thereto at intervals would soon cross. As upon the record herein we must decline any attempt to determine the location of the line of low water, we do not know whether by following the theory adopted by the trial court any upland owner would be deprived of access to open water, but we do hold that the trial court's theory, which appears to have the support of the staff of the state land commissioner, is erroneous.

The trial court found that appellants had failed to establish their ownership of any portion of the tidelands by adverse possession thereof for the statutory period. As above stated, the evidence does not preponderate against this find-

ing, and we approve the same. The court found that, for more than ten years prior to the institution of the action, the tidelands described in respondents' complaint were in the open, notorious, and exclusive possession of respondents, and of their predecessors in interest. This finding finds no substantial support in the record and must fall, with the court's finding establishing the boundary line between respondents' tidelands and those owned by appellants, as shown by the decree and indicated on the foregoing plat.

The decree appealed from is accordingly reversed and the cause remanded, with instructions to proceed to establish the boundary line between the tidelands owned by appellants and those owned by respondents by applying the rule hereby approved, or, if that prove to be impossible, the court shall appoint commissioners to establish the boundary line, subject to approval by the court, according to law.

ALL CONCUR.