[No. 18924-1-II. Division Two. October 18, 1996.]

ROSS LLOYD, ET AL., *Appellants*, v. RICHARD MONTECUCCO, ET AL., *Respondents*.

---

848

*Jack W. Hanemann, Ron D. Shultz,* and *Hanemann, Bateman & Jones,* for appellants.

*James V. Handmacher* and *Bonneville, Viert, Morton & McGoldrick,* for respondents.

BRIDGEWATER, J. — The Lloyds appeal a judgment entered in a boundary dispute that quieted title in their neighbors, the Montecuccos, to a tract of land between

their lots. Both lots were patented[1] before statehood and front Eld Inlet. We hold that the trial court correctly determined that the Montecuccos established adverse possession of the disputed tract on the bluff down to the bulkhead by exclusive and continuous possession for more than 10 years with uses including installing a fence, gardening, planting and harvesting trees, and tending a lawn. But we hold the trial court erred when it adjusted the boundary in the tidelands because the Montecuccos did not establish ownership of that disputed tract by possession sufficiently open and notorious or certain and well-defined to acquire title by adverse possession or mutual recognition and acquiescence. Because the record is insufficient regarding the lateral boundary extending waterward of the meander line, further proceedings in the trial court are necessary. We affirm in part, reverse in part, and remand.

The Lloyds and the Montecuccos own adjoining waterfront lots. Lot 1, owned by the Montecuccos, lies south of Lot 2, owned by the Lloyds. Both lots front Eld Inlet to the west. The Montecuccos purchased Lot 1 in 1971. The Lloyds purchased Lot 2 in 1989.

In 1971, the Montecuccos constructed a bulkhead to protect their steep bank from erosion.[2] In 1973, they built a cyclone fence that runs northerly atop the steep bank, then turns and runs east-southeasterly on a bluff overlooking Lot 2. A 1993 professional survey showed that both the bulkhead and part of the cyclone fence encroached approximately 11 feet onto Lot 2. The steep bank descends from the western edge of the fence, through seven stumps, several of which lie in Lot 2, to the bulkhead below. The trees were planted and then harvested by the Montecuccos over a period of time greater than 10 years. The

---

[1] A patent is an instrument by which the United States grants public lands to individuals. *See* BLACK'S LAW DICTIONARY 1125 (6th ed. 1990), and *Scurry v. Jones*, 4 Wash. 468, 468-70, 30 P. 726 (1892).

[2] The bulkhead is also referred to in the record as the sea wall.

stumps and the bulkhead are separated by approximately 45 feet. Enar Shoblom, the owner of Lot 2 from 1955 to 1986, knew the Montecuccos had constructed the bulkhead and the fence and that the Montecuccos maintained the property around the fence to the edge of the bluff and down the steep bank to the bulkhead. Shoblom never knew while he owned Lot 2 that the fence and the bulkhead encroached onto his lot.

Shortly after the Lloyds purchased Lot 2 in 1989 from an interim owner, they sued the Montecuccos, seeking to quiet title in themselves to the southerly portion of Lot 2 directly north and west of where the Montecuccos had erected the cyclone fence. The Montecuccos answered with several affirmative defenses, including that they adversely possessed the disputed tract, that the boundary as recognized by themselves and the former owners of Lot 2 constituted the correct boundary, that the Lloyds were estopped from alleging ownership to the disputed areas, that the Lloyds had no legal or equitable right to take the property, and that the Lloyds' suit was frivolous and without merit. The Montecuccos then moved for summary judgment, in support of which they averred that they had mowed the area on the outside perimeter of the fence continuously for 20 years, and, at one time, maintained a garden on the outside perimeter of the fence. The trial court granted partial summary judgment in favor of the Montecuccos, concluding there was no genuine issue of material fact regarding the Montecuccos' adverse possession of property just north of the fence, and west of the fence to the northwest corner of the bulkhead. The trial court determined, however, that "ownership westerly of the sea wall shall be decided at trial or by subsequent motions." The parties went to trial on the issue of ownership of those tracts "westerly of the sea wall."

■ A professional surveyor submitted planimetric mapping depicting the common platted boundary of Lots 1 and 2 extending approximately 200 feet out into the tidelands to a government surveyed meander line. The surveyor

testified that the meander line was the western boundary of Lots 1 and 2:

> The upland property was patented, that is, sold by the Federal Government in 1869, and because it was patented prior to statehood, the ownership of the upland goes to the meander line. It is a rule of boundary in this state.

His statement is sufficiently consistent with *Harris v. Hylebos Indus., Inc.*, 81 Wn.2d 770, 505 P.2d 457 (1973), which cites the rule that the water boundary of land patented before statehood, where the patent contains no water boundary description, is stationary at the meander line if the meander line is lower than the line of ordinary high tide. *Harris*, 81 Wn.2d at 772. The surveyor also testified that upland owners owned a portion of the oysterlands, shown on the assessor's map to be situated waterward of the meander line. He read into the record the following legal description from the Lloyds' 1989 deed:

> Together with tidelands suitable for the cultivation of oysters lying in front of, adjacent to and abutting upon said Lot 2 and between the north and south lines thereof extending westerly to the westerly line of tract conveyed by the State of Washington to August Kludt and [F]rank Bonell by deed dated August 19, 1901.

Richard Montecucco recalled that his ownership also extended waterward of the meander line. The oysterlands tract extends an indeterminate distance waterward of the meander line.

Testimony at trial showed that the Montecuccos had seeded the area between the bulkhead and the meander line with oysters, had laid clam nets, had moored their boat to a buoy connected to hasps anchored on or near the northern border of the disputed tidelands tract, and had set 40-pound concrete blocks on a line no farther than eight feet west of the northwest corner of the bulkhead. Tidal action necessitated replacing the concrete blocks and hasps on several occasions.

Following trial, the trial court concluded in its oral deci-

sion that the Montecuccos failed to show adverse possession of the disputed area west of the bulkhead. The Montecuccos filed a motion for reconsideration, contending that they had established ownership of the disputed tract west of the bulkhead through the doctrine of mutual recognition and acquiescence. The trial court agreed. The Lloyds appeal.

I

UPLANDS

The Lloyds contend that the trial court erred granting summary judgment for the Montecuccos based upon adverse possession of the upland[3] tract because genuine issues of material fact were raised regarding possession for 10 years and open and notorious use. The Montecuccos contend there were no genuine issues of material fact and that they are entitled to judgment as a matter of law.

The appellate court reviewing a summary judgment considers the matter de novo and makes the same inquiry as the trial court: summary judgment is appropriate when the pleadings, depositions, and admissions on file, together with the affidavits, if any, show there is no genuine issue about any material fact and, assuming facts most favorable to the nonmoving party, establish that the moving party is entitled to judgment as a matter of law. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982); CR 56(c). In order to establish a claim of adverse possession, there must be possession for 10 years that is: (1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile. *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6 (1989); RCW 4.16.020. The holder of legal title is presumed to have possession; the party claiming to have adversely possessed the property has the burden of

---

[3]We refer to the several tracts as follows: the upland tract includes the surface land up to the bulkhead; the tidelands includes the tract bounded by the bulkhead and the meander line; the oysterlands refers to the tract waterward of the meander line.

establishing the existence of each element. *ITT Rayonier*, 112 Wn.2d at 757. Adverse possession is a mixed question of law and fact: whether the essential facts exist is for the trier of fact, but whether the facts constitute adverse possession is for the court to determine as a matter of law. *Peeples v. Port of Bellingham*, 93 Wn.2d 766, 771, 613 P.2d 1128 (1980), *overruled on other ground, Chaplin v. Sanders*, 100 Wn.2d 853 (1984).

■ ■ We agree with the Montecuccos that there were no genuine issues of material fact regarding the 10-year period and open and notorious use of the upland tract. In order to be open and notorious, the possession must be visible and known or discoverable to the true owner. 17 WILLIAM B. STOEBUCK, WASHINGTON PRACTICE REAL ESTATE: PROPERTY LAW § 8.11, at 499 (1995). Enar Shoblom, former owner of Lot 2, stated that he knew the Montecuccos maintained the area between the fence and the bulkhead during the 16 years that they were neighbors. The Montecuccos planted and then harvested trees in the disputed wooded area. Uncontroverted testimony shows that the Montecuccos maintained the area around and on the northern perimeter of the fence for over 10 years. The abandoned "garden" is on the border of or within that maintained area. Summary judgment in favor of the Montecuccos was correct. The Lloyds fail to create a genuine issue of material fact by claiming that they could not see the fence or the maintained area from their house, or by claiming that the root of a lone rhubarb plant in the abandoned garden was younger than 10 years old.

■ The Lloyds contend the new common boundary drawn in the upland tract by the court was in error because the boundary is straight while the Montecuccos' actual possession would be more fairly represented by a jagged line. Noting that there is no direct evidence the Montecuccos actually possessed every square yard of the disputed tract, we conclude nonetheless that the trial court's demarcation was proper. Courts may create a penumbra of ground around areas actually possessed when

reasonably necessary to carry out the objective of settling boundary disputes. STOEBUCK, § 8.9, at 495. Regarding the straight line the trial court drew between the fence and the bulkhead, courts will project boundary lines between objects when reasonable and logical to do so. *Frolund v. Frankland*, 71 Wn.2d 812, 820, 431 P.2d 188 (1967), *overruled on other ground, Chaplin v. Sanders*, 100 Wn.2d 853 (1984). Courts are not required to find a blazed or manicured trail along the path of the disputed boundary; it is reasonable and logical to project a line between objects when the extent of the adverse possessor's claim is open and notorious as the character of the land and its use require and permit. *Frolund*, 71 Wn.2d at 820. A steep bank and wooded area do not easily permit a clear demarcation. Based upon Shoblom's testimony that he knew the Lloyds maintained the wooded area between the fence and the bulkhead, based upon the Montecuccos planting and harvesting of trees, and considering the area was heavily wooded and steep, the trial court did not err in drawing a straight line between the outside perimeter of the northwest corner of the fence and the northern edge of the bulkhead.

## II

## TIDELANDS

The Lloyds contend that substantial evidence does not support the Montecuccos' claim of mutual acquiescence to the boundary in the tidelands. Specifically, the Lloyds argue that there was no physical evidence designating a boundary line in the tidelands. The Montecuccos respond that the court's ruling may be sustained on the alternative theory of adverse possession. We hold there is insufficient evidence to support either mutual acquiescence or adverse possession to sustain the trial court's adjusted tidelands boundary.

The elements of adverse possession are discussed above. The lower court was in a better position to determine that

adverse possession of the tidelands was not sufficiently visible to be open and notorious, and its conclusion will not be disturbed on appeal. *See, e.g.*, *Spath v. Larsen*, 20 Wn.2d 500, 506, 148 P.2d 834 (1944) ("While from examination of the record our evaluation of the evidence might differ from that of the trial court, it cannot be said that the evidence preponderates against the finding" that "title to the tidelands up to a certain lateral boundary (which they alleged was marked on the ground by a line of stakes) is not vested in them by adverse possession.").

 Recognition and acquiescence is a doctrine of boundary adjustments that supplements adverse possession in the settlement of boundaries. STOEBUCK, § 8.21, at 519. The elements of the doctrine of acquiescence are as follows:

> (1) The line must be certain, well defined, and in some fashion physically designated upon the ground, *e.g.*, by monuments, roadways, fence lines, etc.; (2) in the absence of an express agreement establishing the designated line as the boundary line, the adjoining landowners, or their predecessors in interest, must have in good faith manifested, by their acts, occupancy, and improvements with respect to their respective properties, a mutual recognition and acceptance of the designated line as the true boundary line; and (3) the requisite mutual recognition and acquiescence in the line must have continued for that period of time required to secure property by adverse possession.

*Lamm v. McTighe*, 72 Wn.2d 587, 592, 434 P.2d 565 (1967). The second element of the doctrine is satisfied by Enar Shoblom's testimony that he expressly agreed with the Montecuccos that the tidelands boundary was an extension of the same upland boundary established by adverse possession. The third element — that the recognition and acquiescence continued for 10 years — is uncontroverted. It is the first element that is not satisfied. The designated tidelands boundary is not certain and well-defined by the Montecuccos' placement of errant concrete blocks, intermittent moorage, and seeding of oysters and clams. In

*Johnston v. Monahan*, 2 Wn. App. 452, 469 P.2d 930, *review denied*, 78 Wn.2d 993 (1970), this court doubted that marking a water boundary with two concrete blocks at points approximately 200 feet apart could constitute sufficient marking and assumption of possession so as to give constructive notice of a tidelands boundary line. *Johnston*, 2 Wn. App. at 461. In *Spath*, the Supreme Court contemplated that a line of stakes planted in the ground might be substantial evidence of a boundary, at least for adverse possession. *Spath*, 20 Wn.2d at 506. There was no line of stakes here. We hold that the placement of concrete blocks moveable by tidal action and placed only eight feet from the bulkhead, intermittent moorage, and seeding of oysters and claims are insufficient to establish a clear and well-defined line for the purpose of satisfying the doctrine of recognition and acquiescence. The trial court erred in extending the line from the northwest corner of the bulkhead to the meander line. Consequently, we reverse in part and order that the trial court enter the correct line of the lateral tidelands boundary from the bulkhead to the meander line as identical to the platted legal boundary represented in the 1993 planimetric mapping, entered as Exhibit 1.

## III
## OYSTERLANDS

■ We now address the trial court's conclusion that the lateral boundary extending waterward from the meander line out into Eld Inlet was a linear extension of the platted legal boundary represented in the planimetric mapping. We note the trial court attempted to resolve the parties' dispute by simply extending the lateral boundary through the oysterlands, but was not presented with a county plat, lateral boundary descriptions, or controlling caselaw. In *Spath,* the court stated the boundary rule that lateral tideland boundaries along a comparatively straight shore may be "determined by erecting lines perpendicular to the . . . water boundary of the upland, at points where

property side lines intersect the [water boundary]." *Spath,* 20 Wn.2d at 512 (citing *Knight v. Wilder,* 56 Mass. (2 Cush.) 199, 48 Am. Dec. 660 (1848)). In *Spath,* the original grant conveyed " '[a]ll tide lands of the second class, owned by the state of Washington, situated in front of, adjacent to and abutting upon lots 1, 2 and 3.' " *Spath,* 20 Wn.2d at 501 (quoting recorded deed). *Knight* holds that this boundary rule applies when the lateral or side lines are not otherwise established by the terms of the grant under which the upland owner holds. *Knight,* 45 Am. Dec. at 663. Because neither party submitted to the trial court a description of the 1901 grant to the oysterlands adjacent to Lots 1 and 2, it is not possible for this court to review the applicability of *Spath* or the propriety of the trial court's oysterlands lateral boundary. Both the Lloyds and the Montecuccos agree in supplemental briefing to this court that *Spath* controls the determination of the angle of the disputed lateral boundary in the oysterlands tract, although the Lloyds consider *Spath* to allow for judicial flexibility. We remand for further proceedings as necessary to determine the common boundary across the oysterlands.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

HOUGHTON, A.C.J., and ARMSTRONG, J., concur.

Reconsideration denied November 27, 1996.

Review denied at 131 Wn.2d 1025 (1997).