# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| HOOD CANAL SHELLFISH COMPANY, LLC, a Washington limited liability company; MARLENE IDDINGS, LINDA SLATES, LLOYD E. IDDINGS, and RENEE HANOVER, individuals, | No. 53486-0-II |
| Petitioners, | Consolidated With |
| v. | No. 53616-1-II |
| STATE OF WASHINGTON, DEPARTMENT OF NATURAL RESOURCES, | |
| BK LOVELY, LLC, a Washington limited liability company; STEVEN LOVELY, individually, SUSAN LOVELY, individually, and the marital community composed thereof; VIRGIL G. TIMMERMAN, individually, JESSIE DORENE TIMMERMAN, individually and the marital community composed thereof; PHILLIP PAUL ELDER, individually; LISA MARLENE IVEY, individually; TIMOTHY L. CLEMENTS, individually, PAMELA J. CLEMENTS, individually, and the marital community composed thereof; PETER F. MARTINEZ, individually, NANCY D. MARTINEZ, individually, and the marital community composed thereof; MICHAEL GRIFFITH, individually, SUE A. GRIFFITH, individually, and the marital community composed thereof; LAURE A. IDDINGS, individually, and the marital community of LAURE A IDDINGS and LLOYD E. IDDINGS; EARL J. IDDINGS, individually; CARON DENOTTA, individually; and D.D. DENOTA, LLC, a Washington limited liability company, | UNPUBLISHED OPINION |
| Respondents. | |

No. 53486-0-II
Cons. No. 53616-1-II

WORSWICK, J. — Hood Canal Shellfish Company (HCSC), Virgil Timmerman, and other owners of Dewatto Bay tidelands appeal an order granting summary judgment to the Washington Department of Natural Resources (DNR) in a property dispute concerning those tidelands.[1] The trial court ordered that the tidelands be equitably divided according to a survey ordered by DNR. HCSC and Timmerman each own separate tideland parcels on opposite sides of the tidelands DNR claims: Timmerman to the northeast and HCSC to the west and south. The equitable division ordered by the trial court reduces the size of HCSC and Timmerman's tideland claims as well as HCSC's upland parcel.

Timmerman argues that the trial court erred when it granted DNR summary judgment because (1) DNR's claim is barred by res judicata; (2) DNR waived its claim to any portion of Timmerman's tidelands in prior litigation; (3) DNR should be equitably estopped from asserting a claim to any portion of Timmerman's tidelands; (4) DNR's claim to the disputed tidelands is barred by laches; and (5) that general equitable principles should not be used to divide the tidelands. HCSC incorporates Timmerman's arguments, and also argues that (6) it is entitled to summary judgment on its quiet title claim against DNR based on evidence extrinsic to its tideland deed; and (7) that the survey ordered by DNR was fatally flawed and improperly reapportioned HCSC's upland property.

---

[1] We refer to Hood Canal Shellfish Company and other owners of Dewatto Bay tidelands collectively as HCSC. Because Timmerman filed a separate brief with distinct arguments, he is referred to separately.

2

First, we hold that DNR's claim on Timmerman's parcel is barred by res judicata. Second, we hold that equitable division of the tidelands is appropriate as a matter of law but that genuine issues of material fact exist as to the boundaries set by DNR's survey. Finally, we hold that the trial court erred when it adopted DNR's survey results as to the extent of HCSC's upland plot. Accordingly, we affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion.

FACTS

I.  Historical Background

This dispute has its roots in Washington's tideland ownership and grant system. The Washington State Constitution, adopted in 1889, contains a declaration of State ownership over all submerged lands in navigable waters up to and including the line of ordinary high water. CONST. art. XVII, § 1. This declaration divested upland owners of all riparian rights, including the right of access to deep water. *Eisenbach v. Hatfield*, 2 Wash. 236, 240-41, 26 P. 539 (1891). The State was not, however, prohibited from subsequently selling such submerged lands and rights. *Davidson v. State*, 116 Wn.2d 13, 16, 802 P.2d 1374 (1991). The State's first Legislature "authorized the sale of tideland and shoreland and provided a purchase preference to the abutting upland owners." *Davidson*, 116 Wn.2d at 16; LAWS OF 1889–90, ch. 14, p. 431.

Between 1889 and 1971, the State, through DNR and its predecessor agencies, including the Department of Public Lands (DPL), sold tidelands into private ownership. *See generally* Chapter 79.125 RCW (aquatic lands—tidelands and shorelands). The State conveyed tidelands by deeds that usually described the abutting upland parcel. Deeds would typically describe tidelands as "in front of" or "abutting" the described upland parcel, without clearly defining the

3

lateral boundaries. Clerk's Papers (CP) at 404. The State rarely used metes and bounds to describe tideland deeds. In 1971, the Legislature halted the State's sale of tidelands. LAWS OF 1971, 1st Ex. Sess. Ch. 217, § 2; RCW 79.125.200. Tidelands not sold were retained by the State. *See* CONST. art. XVII, § 1. To determine remaining State tidelands, DNR subtracted the parcels previously sold based on descriptions in the deed to determine those lands remaining in State ownership.

Beginning in 1891, the State designated certain tidelands as oyster reserves to preserve and grow natural oyster beds. LAWS OF 1891, ch. 150, § 1. As Washington's shellfish industry changed, the State began vacating oyster reserves that it determined no longer required protection. LAWS OF 1929, ch. 224, § 1. After an oyster reserve was vacated, the State could sell the tidelands. *Id*. The statute providing the procedures for the sale of tidelands gave the owners of abutting uplands a preferential right to purchase the tidelands abutting their upland parcels. LAWS OF 1927, ch. 255, § 121.

The State designated Dewatto Bay an oyster reserve in 1895 and vacated it in 1930. A 1930 survey of Dewatto Bay shows the entire southern and eastern halves of the bay as "Reserve No. 2 Area." Suppl. CP at 2517. Regardless of the reserve designation, the record shows that the State deeded some parcels of tidelands within the Dewatto Bay reserve before it was vacated.

## II. TIMMERMAN'S CLAIM: THE MURRAY TIDELANDS



CP at 380.

In 1896, James Murray—Timmerman's predecessor in interest—owned the uplands in the eastern portion of Government Lot 5 on the south side of Dewatto Bay. Government Lot 5 forms a headlands that protrudes north into the bay, as shown in the portion marked "School District Uplands" in the image above.[2] CP at 690. Government Lot 5 also includes the Reidell uplands, which HCSC now holds title to and will be described in Part III, *infra*.

---

[2] Mason County School District owned the remainder of the headlands and is DNR's predecessor in interest. The school district transferred the upland parcel to DNR in 1982.

In 1903, despite the statutory ban on the sale of oyster reserves, the State sold Murray a parcel of second class tidelands.[3] The deed conveyed to Murray "All tide lands of the second class owned by the State of Washington, situate in front of, adjacent to or abutting upon [a] portion of the United States government meander line." CP at 694. The deed did not convey the tidelands in association with an upland parcel, but instead defined the tidelands with calls along the government meander line in detail by angles and chain lengths.

Under the laws in effect at the time the State conveyed the tidelands to Murray, tidelands extended waterward only down to mean low tide. LAWS OF 1897, ch. 89, § 4. In 1903, the lateral boundaries of the Murray tidelands would have been determined from using the angles and limiting points listed in the deed along the meander line and extending perpendicular lines from those limiting points to the waterward limit. Thus, the Murray tidelands occupy a narrow strip wrapping around the northern tip of the headlands between ordinary high water and mean low tide.

In 1966, Timmerman's predecessor in interest sued to quiet title to the Murray tidelands. CP at 755 (Claim in a Quiet Title Action, *Margett v. Armour*, Mason County Super. Ct. No. 9217, July 23, 1966) (*Margett* litigation). DNR was a party to the *Margett* litigation. CP at 765-67. DNR filed an answer to the quiet title complaint and argued that the deed to the Murray tidelands was void. DNR requested the court "quiet[] title" to the Murray tidelands. CP at 766.

---

[3] "'Second-class tidelands' means the shores of navigable tidal waters belonging to the state, lying outside of and more than two miles from the corporate limits of any city, and between the line of ordinary high tide and the line of extreme low tide." RCW 79.105.060(18).

The *Margett* litigation did not proceed to trial because the parties stipulated to an order of dismissal with prejudice.

The *Margett* litigation was resolved when Timmerman's predecessor in interest settled with the State for $1,000.00. In exchange, the State affirmed the validity of the Murray tideland deed and the trial court ordered that the State "shall have no further claim of right to the property described herein." CP at 773. The Commissioner of Public Lands then confirmed this settlement in a letter, restated the language from the deed, and ordered that the $1,000.00 was "payment in full for any claim the State of Washington may have had in any of the tidelands herein described." CP at 77.

Timmerman acquired an ownership interest in the Murray tidelands in 1977. He has improved and maintained the tidelands and previously-built structures there since acquiring ownership.

### III. HCSC'S CLAIM: THE REIDELL TIDELANDS

HCSC's predecessor in interest to its tidelands claim was Theresa Reidell. Reidell purchased an upland plot on the southwest shore of Dewatto Bay in 1933. At that time, the upland parcel to the east of her property, containing the headlands, was owned by the Mason County School District.

A. *Reidell Upland Deed*

In 1912, Clara and W.M. Nance owned the majority of the Government Lot 5 uplands, including both the school district and Reidell parcels. A 1912 warranty deed conveyed an uplands parcel west of the headlands to James Harden Nance. The 1912 deed defined the dividing boundary as "the line along the aforesaid gulch to run on the south and west side of

aforesaid creek . . . not to touch or cross aforesaid creek." CP at 1058. The 1933 deed that

conveyed the uplands from James Harden Nance to Reidell was identical:

> All that portion of Government Lot five (5), Section twenty-eight (28), Township twentythree [sic] (23) North, Range three (3) West, W.M., which lies South and West of the main gulch and creek, the line along the aforesaid gulch to run on the South and West side of aforesaid *creek*, commencing at the meander line on the shore line between the aforesaid Lot 5 and the tide land at or near the base of the hill, where the bottom land meets the base or foot of the hill, then meander around the aforesaid base of the hill straight from point to point, not to touch or cross the aforesaid *creek*, to the south line of the aforesaid Lot 5 . . . .

CP at 1061-62 (emphasis added). This parcel lies south of Dewatto Bay and to the southwest of

the headlands, as depicted in the image above in Part II, *supra*. The Estate of Carrie Nance

conveyed the headlands parcel to the Mason County School District in 1929.

Lloyd and Marlene Iddings purchased the upland parcel in 1959. The 1959 special

warranty deed differed slightly from the above, stating, in pertinent part that the parcel would " .

. . then meander around the aforesaid base of the hill straight from a point to point, not to touch

or cross the aforesaid *gulch* . . . ." CP at 898 (emphasis added). Similarly, a 1961 survey

commissioned by the school district (the Sadler survey) interchanged the words "creek" and

"gulch" earlier in the description, describing the parcel as "south and west of the main gulch and

creek. The line along the aforesaid gulch to run south and west of the aforesaid *gulch*. . . . not to

touch or cross aforesaid *creek* . . . ." Suppl. CP at 2522 (emphasis added).

Today, appellant Marlene Iddings owns and resides on the western portion of the Reidell

upland parcel. Appellants Laure and Lloyd Earl Iddings own the eastern portion of the Reidell

upland parcel that abuts the boundary along the creek and gulch. The Iddings formed HCSC in

8

2014 with other tideland owners Linda Slates and Renee Hanover. HCSC also owns an interest in the Reidell upland parcel.

B.    *Reidell Tideland Deed*

In 1934, during Reidell's ownership of the upland parcel, she first wrote to the Commissioner of Public Lands of the State of Washington and asked to apply to purchase the tidelands abutting her upland parcel. However, another party held a log booming lease on that portion of Dewatto Bay. In 1937, Reidell applied to purchase tidelands from DPL. Her application stated she wished to purchase the second class tidelands that were in a tract of the vacated oyster reserve, to include a parcel "[i]n front of . . . Lot 5." CP at 161. Reidell requested the State notify the school district of her application. The application form asked, "Are you the owner of the abutting uplands?" to which Reidell responded, "Yes & School Dist[rict]." CP at 161.

However, DPL disregarded Reidell's 1937 application and instead approved another log booming lease for the whole of Dewatto Bay. Another company, Pope and Talbott Inc., renewed the log booming lease until 1947. In 1945, after Reidell's daughter requested an update from DPL, the Commissioner wrote to tell Reidell to re-apply shortly before the expiration of the Pope and Talbott log booming lease.

Reidell refiled her application to purchase tidelands in 1946. Reidell again requested to purchase a tract of vacated oyster reserves "[i]n front of part of Lot 5." CP at 188. In an affidavit included in her application for title to the tidelands, Reidell described the tidelands she requested title for to include "vacated oyster reserve land in front of a portion of lot 5." CP at 193. She stated, "There are some oysters and clams on the north west tip of oyster reserve only .

9

. . . Clams and oysters are few and confined to a small rise at some distance from silt-wash." CP at 193. This "small rise" is a spit that is revealed at low tide to extend westward from the northwest tip of the headlands.[4]

The Commissioner responded to Reidell's application and asked her for additional details concerning her request because her affidavit was not sworn before a notary. Reidell responded with a notarized copy of her upland deed and a hand-drawn map depicting the southern portion of the bay, the Reidell upland parcel, and a box to the north of the parcel (abutting the school district headlands) marked "Oyster and Tidelands." CP at 200. The Commissioner responded: "It is likely that this map will be of considerable assistance to us in processing your application." CP at 202.

Subsequent documentation shows that there was conflict between Reidell's application and Pope and Talbott's renewal request for a log booming lease. The Commissioner explained to Pope and Talbott that Reidell's application covered "the major portion of the vacated oyster reserve in front of the W1/2 [western half] of said lot 5" and returned its application. CP at 208. The State then conveyed tidelands in a deed to Reidell. The deed describes the tidelands conveyed relative to the Reidell upland parcel:

> Those portions of the tide lands of the second class and vacated State Oyster Reserve No. 2, Plat No. 137, situate in front of, adjacent to, or abutting upon that portion of Government Lot 5, Section 28, township 23 north, range 3 west, W.M., described as follows:
> That portion of said Government Lot 5, lying east of a line which is 20 feet east of and parallel to the west line of said Lot 5, and southerly and westerly of the

---

[4] A note written on Reidell's application states that her request would exclude listed tidelands under Deed V.4P.271. HCSC states that this refers to the Murray headlands. Although this appears to be true, the deed number does not appear elsewhere in the record and thus this reference cannot be verified in the record on appeal.

main creek running through said Lot 5 and having a frontage of 5.76 lineal chains; more or less.

The above description is intended to convey such tide lands as lie in front of a tract of uplands owned by Therese D. Reidell on November 18, 1946.[5]

CP at 216.

When the Iddings purchased Reidell's property in 1959, they also purchased the tidelands as described above. Over time, Reidell tidelands have been transferred among members of the Iddings family but have remained under the family's ownership since 1959. The Iddings conveyed the Reidell tidelands to HCSC in 2015.[6]

C.      *School District Uplands and DNR's Claim*

In 1967, the Mason County School District applied to purchase tidelands abutting the headlands. The application requested tidelands "situate in front of" its abutting uplands, running along the high tide line and "[e]xempting County roads, if any, together with a prior rights to the said grantee to the use of waters of said creek to the extent of its needs." Suppl. CP at 2487.

---

[5] All Dewatto Bay tideland deeds use some form of the "in front of" language. CP at 969-77. However, the third paragraph of the Reidell deed is unique among other Dewatto Bay tideland deeds in that it restates the "in front of" language used in the first paragraph.

[6] HCSC and Timmerman state in their opening briefs that the Commissioner of Public Lands also wrote a letter to Reidell's estate in 1956. The letter states that Reidell was granted "those second class tideland and vacated oyster reserve in front of the W1/2 of said lot 5. Excluded from Mrs. Reidell's purchase [were] tidelands conveyed to Mr. James Murray in 1903." CP at 218.

In its brief, DNR makes a motion to strike (1) the 1956 letter described above, and (2) Appendix A to HCSC's brief which contains a Google maps printout with lines depicting the approximate contested areas. We do not consider the 1956 letter (1) because we are not considering extrinsic evidence to interpret the tideland deeds. We consider HCSC's Appendix A (2) for illustrative purposes only and recognize that it is not a surveyor's depiction of the boundaries.

DNR denied the school district's application in 1971 because DNR and the school district were discussing exchanging upland parcels.

The school district conveyed the upland parcel containing the headlands to DNR in 1982. The deed described the parcel in part as running "along the main gulch and creek on the South and West side thereof at the toe of the slope at the base of the hill." Suppl. CP at 2490.

In a 2013 letter, DNR informed HCSC of its ownership claim to the tidelands to the west of the headlands. DNR stated, "I am enclosing the original deed to Theresa Reidel [sic] which conveyed certain tidelands from the state in 1947. The tidelands immediately north of her tract were never sold and remain in state ownership." CP at 315. The 2013 letter contained copies of a 1992 survey (the R.M. Winters Co. Inc. survey). The Winters survey showed the HCSC tidelands as abutting its upland parcel, but not reaching the extreme low tide mark or extending north along the headlands. Instead, the Winters survey showed DNR owning a large tidelands parcel extending west off the headlands.

## IV. PROCEDURAL HISTORY

In 2015, HCSC filed suit against DNR to quiet title to the tidelands and recover damages for inverse condemnation and conversion. DNR filed an answer and brought counterclaims against HCSC and other tideland owners to quiet title and for trespass and damages. In the alternative, DNR sought to quiet title by adverse possession. DNR's answer and counterclaim did not seek to quiet title to any upland parcel.

In its counterclaim, DNR abandoned the tidelands division shown in the Winters survey and argued that the tideland parcels be determined by "equitable apportionment." CP at 10. DNR relied on *Spath v. Larsen*, 20 Wn.2d 500, 148 P.2d 834 (1944), which provides a method

for equitable division of tideland parcels along curved shorelines where the lateral boundaries of contested tidelands are not unambiguously defined in a tideland deed.  DNR, HCSC (through the Iddings family), and Timmerman each hired surveyors who submitted surveys and declarations in support of each parties' position.

A.      *McEvilly Survey*

In support of its theory of equitable division, DNR commissioned Michael McEvilly to conduct a survey of the area (the McEvilly survey).  McEvilly determined that the tideland deeds in Dewatto Bay in the area of the surveyed headlands do not include metes and bounds or any other description of lateral boundaries.  Because of the curved shoreline west of the headlands, McEvilly determined the lateral boundaries of those tidelands, including the Reidell tidelands, should be determined through a proration process, which McEvilly described as equitable apportionment under *Spath*.

The McEvilly survey also placed upland boundaries on which to base the lateral tidelands boundaries.  As a result, the McEvilly survey placed the upland division between the Reidell uplands and the DNR uplands west of the creek described in the Reidell uplands deeds.  In his declaration, McEvilly cited the 1959 deed description that conveyed the Reidell uplands to the Iddings, which described the dividing line as "meander[ing] around the aforesaid base of hill straight from a point to point, not to touch or cross the aforesaid *gulch*."  Suppl. CP at 2542 (emphasis added).  McEvilly concluded: "While some slight variations on the language exist in various deeds, the fact that the line is intended to run along the base of the hill, as opposed to along the creek, is not in doubt."  Suppl. CP at 2542.

13

After placing the uplands dividing line to the west of the creek, the McEvilly survey divided all the tidelands west of the headlands at an angle from the shore to the northwest. McEvilly divided the tidelands between a Northeasterly Cove Limit running northwest from the headlands, and a Westerly Cove Limit on the western extremity of the affected tidelands. As shown below, the McEvilly survey lines are drawn such that HCSC's tidelands would not include any of the "small rise" or spit off the western tip of the headlands.



Suppl. CP at 2557.

The McEvilly survey also alters the western boundary of the Murray tidelands (owned by Timmerman) to accommodate the apportionment McEvilly determined fit the shape of the shoreline. The result of the McEvilly survey is a domino effect, where each tideland parcel west of the headlands is redrawn to accommodate DNR's ownership of the spit. As a result, DNR included Timmerman and other tideland owners in a third-party complaint. DNR sued to quiet title, claiming superior title to the tidelands west of the headlands and stating that Timmerman and the other tideland owners' parcels would be affected by its claim for equitable apportionment under *Spath*.[7]

B.      *Ferguson and Thalacker & Wilson Surveys*

The Iddings family hired Terrell Ferguson to conduct a survey in 2014 (the Ferguson survey). The Ferguson survey was based on the deeds and extrinsic communications related to the Reidell tidelands.[8] Ferguson concluded that Reidell unambiguously intended to purchase

---

[7] DNR also listed trespass to public lands and ejectment, wrongful taking of shellfish from public lands, and obstructing the taking of shellfish against HCSC and the Iddings in this complaint. However, these claims were not resolved on summary judgment.

[8] After the trial court issued its summary judgment ruling, HCSC moved to strike the McEvilly Survey in the trial court. In support of this motion, HCSC submitted a declaration by Ferguson criticizing the McEvilly survey. In its brief, DNR moved to strike HCSC's motion and Ferguson's declaration. Br. of Resp't at 47-48. We do not consider either HCSC's motion or Ferguson's declaration in support of that motion because they were added to the record after the trial court rendered its ruling on summary judgment. RAP 9.12 ("On review of an order granting or denying a motion for summary judgment the appellate court will consider only evidence and issues called to the attention of the trial court.")

tidelands directly north of the Reidell upland parcel to include the spit. Ferguson disputed the McEvilly survey and concluded that equitable apportionment was inappropriate.

The Ferguson survey also analyzed the Reidell upland parcel. Ferguson concluded that the creek defined the eastern boundary between the Reidell upland parcel and the DNR headlands parcel. The Ferguson survey divides the parcels using the language from the 1913 deed, which divides the properties on a "line along aforesaid gulch to run on the South and West side of aforesaid creek." CP at 1054. Ferguson disagreed with the upland division proffered by McEvilly, explaining, "This is a controlling factor because it is the very beginning of the legal description and uses a very definable physical feature to be used as a boundary. There is less confusion over where a creek is as opposed to where a 'base of hill' is defined." CP at 1054.

Timmerman hired Robert Wilson and John Thalacker to create a survey (the Wilson & Thalacker survey). The Wilson & Thalacker survey determined that the McEvilly survey erred in determining the meander corners associated with the Murray tidelands. The Wilson & Thalacker survey determined the corners and lateral boundaries of the Murray tidelands based on an interpretation of tideland boundaries using 1903 standards—the year the tidelands were deeded to Murray. Wilson & Thalacker also declared that the McEvilly survey did not appropriately equitably apportion the remaining tidelands. Wilson & Thalacker opined that the McEvilly survey positioned the Cove Limits arbitrarily and that different locations for those limits must be determined based on "naturally-occurring geologic features." Suppl. CP at 2046.

C.      *Summary Judgment*

In February 2019 the tideland owners, including HCSC and Timmerman, moved for summary judgment. They sought summary judgment on their quiet title claim and to dismiss

16

DNR's claim of adverse possession. DNR also filed a motion for summary judgment on its counterclaim to quiet title to the tidelands.

The trial court granted DNR's motion for summary judgment. The trial court explained: "*Spath v. Larsen*, 20 Wn.2d 500, 148 P.2d 834 (1944) established the legal standards to determine the lateral boundaries of tidelands owned by adjacent owners in a cove and is the controlling case law for the adjudication of this case." CP at 1668. The trial court therefore ruled that DNR holds superior title to the tidelands west of the headlands and adopted the McEvilly survey as depicting the boundaries for both the equitable apportionment of the tidelands and the upland parcels. The trial court therefore denied HCSC and the other tideland owners' motions. The trial court did not enter a decision as to adverse possession or trespass and resolved the dispute in favor of DNR only on the grounds of equitable apportionment under *Spath*.

HCSC, the Iddings, Timmerman, and other tideland owners timely appealed.

ANALYSIS

Timmerman argues that DNR is barred by res judicata from claiming any interest in the Murray tidelands. HCSC argues that the trial court erred when it applied the equitable principles in *Spath* to apportion the tidelands. Next, HCSC argues it is entitled to summary judgment on its quiet title claim because the extraneous evidence contemporaneous to Reidell's application to purchase the tidelands establishes she intended to purchase the tidelands in the disputed area. HCSC further argues that the trial court erred when it reapportioned and quieted title to the upland parcels. DNR argues that the trial court properly awarded summary judgment, applied *Spath*, and adopted the McEvilly survey.

17

No. 53486-0-II
Cons. No. 53616-1-II

We hold that res judicata bars DNR from claiming interest in the Murray tidelands. Although we agree with DNR that the trial court properly applied *Spath* to the apportionment of the tidelands along the curved shore, we hold that there are genuine issues of material fact regarding the boundaries of the concave shoreline to be apportioned and that summary judgment was therefore improper. Accordingly, we neither consider evidence extraneous to the deeds nor grant HCSC summary judgment. Furthermore, we agree with HCSC that the trial court erred when it quieted title to the upland parcels.[9]

## I. STANDARD OF REVIEW

We review a summary judgment ruling de novo. *Keck v. Collins*, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). We perform the same inquiry as the trial court and affirm summary judgment only where "'there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.'" *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013) (quoting *Qwest Corp. v. City of Bellevue*, 161 Wn.2d 353, 358, 166 P.3d 667 (2007)). We "review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Lakey*, 176 Wn.2d at 922. A genuine issue of material fact exists where reasonable minds could differ on a fact that controls the outcome of the litigation. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008).

---

[9] As explained in Part III, *infra*, we construe tideland boundaries with no defined lateral boundaries in favor of the State. *Davidson v. State*, 116 Wn.2d 13, 16, 20, 802 P.2d 1374 (1991). However, we interpret the deeds to upland parcels under the traditional rules of deed interpretation. Thus, *Spath* does not apply to upland boundaries and all upland parcel divisions should be construed to give effect to the intention of the parties, to give particular attention to the grantor's intent, and construed against the grantor where any doubt remains. *Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.*, 168 Wn. App. 56, 64-65, 277 P.3d 18 (2012).

18

Although a moving party is entitled to summary judgment if it submits affidavits establishing that it is entitled to judgment as a matter of law, a nonmoving party need set forth facts only to rebut those contentions to show the existence of a genuine issue of material fact. *Ranger Ins.*, 164 Wn.2d at 552. However, "the nonmoving party 'may not rely on speculation, [or] argumentative assertions that unresolved factual issues remain.'" *Ranger Ins.*, 164 Wn.2d at 552 (alteration in original) (quoting *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986)).

## II. TIMMERMAN CLAIM: THE MURRAY TIDELANDS

Timmerman argues that the trial court erred when it granted summary judgment to DNR because DNR's claim to the Murray tidelands is barred by res judicata. We agree. In the alternative, Timmerman argues that DNR's claim is similarly barred by waiver, equitable estoppel, and laches. Because we agree that res judicata applies, we do not reach those issues.

Res judicata prevents relitigation by parties or privies who have had the opportunity to litigate the same matter in a prior action. *Karlberg v. Otten*, 167 Wn. App. 522, 535, 280 P.3d 1123 (2012). "[R]es judicata prohibits the relitigation of claims and issues that were litigated, or could have been litigated . . . in a prior action." *Karlberg*, 167 Wn. App. at 535. To apply res judicata, there must be identity in the prior and judgment and current action as to (1) persons and parties, (2) causes of action, (3) subject matter, and (4) the quality of the persons against whom the claim was made. *Karlberg*, 167 Wn. App. at 536.

For the purposes of identity of persons, the party in the prior litigation may be in privity with the current party. *Heritage Baptist Church v. Cent. Puget Sound Growth Mgmt. Hearings*

19

*Bd.*, 2 Wn. App. 2d 737, 750, 413 P.3d 590 (2018). Privity exists between the seller and buyer

of real property. *Riblet v. Ideal Cement Co.*, 54 Wn.2d 779, 782, 345 P.2d 173 (1959).

Here DNR's claim against Timmerman is res judicata because of the *Margett* litigation.

(1) The persons and parties are identical: Timmerman's predecessor in interest and DNR were

parties to the *Margett* litigation. (2) Both causes of action were for quiet title. (3) The subject

matter in both cases was a portion of the Murray tidelands. If DNR wanted to argue that *Spath*

applied and that the tidelands in the area should be equitably apportioned, it could have. It did

not. (4) The quality of the persons in each case was the same because Timmerman is in privity

with his predecessor in interest. *Riblet*, 54 Wn.2d at 782. DNR's claim to quiet title to any

portion of the Murray tidelands is, therefore, res judicata.

DNR argues that the *Margett* litigation does not preclude its claim here because DNR is

not asking for Timmerman's deed to be narrowed. But the equitable apportionment ordered

under *Spath* and the McEvilly survey would necessarily alter the boundary of Timmerman's

*parcel*. *See Spath*, 20 Wn.2d at 512-14. Even if Timmerman's deed would not change, the extent

of his parcel would. DNR attempts to get around this by arguing that only the angle of

Timmerman's boundary would change. But our courts have held that after title is quieted a

boundary line may not be altered.

This case is similar to *Karlberg*, there were two adjoining properties and the owners

disputed where to draw the boundary line. 167 Wn. App. at 536. Division One of this court was

presented with whether a litigant may bring successive quiet title actions involving a disputed

boundary, where each time the litigant seeks to move the boundary to expand his own property.

*Karlberg*, 167 Wn. App. at 536. The *Karlberg* court held that the subsequent action was barred

20

by res judicata. 167 Wn. App. at 538-40. The court explained that Karlberg obtained precise

relief in a quiet title action that resulted in a complete legal description of a parcel. *Karlberg*,

167 Wn. App. at 539. Thus, res judicata barred Karlberg's second suit as to the boundary line

only. *Karlberg*, 167 Wn. App. at 540. "Where judgment in the first action determines the

boundary line between two adjoining properties, the judgment is preclusive of future attempts to

move the boundary line in one direction or another." *Karlberg*, 167 Wn. App. at 539-40.

Under DNR's claim and the McEvilly survey, the western boundary of the Murray

tidelands would swing eastward, moving the boundary and cutting off a portion of Timmerman's

parcel. But when the Murray tidelands were deeded in 1903, under the laws in effect at the time,

the tidelands extended waterward down to mean low tide and the lateral boundaries were

determined using the angles and limiting points listed in the deed along the meander line and

extending perpendicular lines from those limiting points to the waterward limit. LAWS OF 1897,

ch. 89, § 4. Thus, the western boundary of the Murray tidelands was set. Accordingly, any

attempt by DNR to lay claim to the Murray tidelands by altering any boundary is res judicata.

The trial court therefore erred when it granted DNR summary judgment as to Timmerman's

tidelands. Thus, the trial court erred when it denied Timmerman's motion for summary

judgment.

III. HCSC CLAIM: THE REIDELL PARCELS

A.      *Legal Principles of Deed Interpretation*

The parties dispute the lateral boundaries of the Reidell tidelands.[10] HCSC argues that

---

[10] The parties appear to agree as to the waterward and landward boundaries of each tideland.

the deeds at issue here should be construed to give meaning to the original parties' intent to determine those lateral boundaries. By looking to the intent of the parties at the time of the Reidell conveyance and relying on extrinsic evidence, HCSC argues that we can determine from the contemporaneous communications between Reidell and DPL the tideland boundaries the parties intended to convey. We disagree.

Interpretation of a deed is a mixed question of fact and law. *Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.*, 168 Wn. App. 56, 64, 277 P.3d 18 (2012). Normally, we construe deeds to give effect to the intention of the parties and give particular attention to the grantor's intent when discerning the meaning of the deed. *Newport Yacht*, 168 Wn. App. at 64. We give meaning to every word in a deed and where the plain language of the deed is unambiguous, extrinsic evidence will not be considered. *Newport Yacht*, 168 Wn. App. at 64. But where there is an ambiguity, we may consider extrinsic evidence. *Newport Yacht*, 168 Wn. App. at 65. Typically, where doubt remains, we will construe a deed against the grantor. *Newport Yacht*, 168 Wn. App. at 65.

However, the rules of normal contractual intent do not apply to aquatic lands granted by the State. *Davidson*, 116 Wn.2d at 20. In *Davidson*, the State established harbor lines along a shoreline in 1921. 116 Wn.2d at 18. The *Davidson* plaintiffs owned property along the shoreline and sued to quiet title to the designated harbor area, contesting the harbor lines. 116 Wn.2d at 15. Our Supreme Court explained that the *Davidson* plaintiffs "characterize[d] the case as one of contractual intent. They contend[ed] the overwhelming evidence shows the parties intended the shorelands' waterward boundary to be the line of navigability." *Davidson*, 116

22

Wn.2d at 19. The *Davidson* plaintiffs argued that mutual intent of the parties established the disputed boundary. *Davidson*, 116 Wn.2d at 19.

Our Supreme Court disagreed. "Where a deed or grant from the State fails to define or limit the boundary of the grant, the boundary will be interpreted most strongly against the grantee rather than the grantor state." *Davidson*, 116 Wn.2d at 20. The court reasoned that our constitution divested upland owners of all riparian rights and thus reserved submerged lands to the State. *Davidson*, 116 Wn.2d at 16, 20. Thus, under *Davidson*, where there are no defined boundaries in a deed, we construe the deed in favor of the State.[11]

This is not a novel concept. Our Supreme Court first set this principle forth in *Pearl Oyster Co. v. Heuston*, 57 Wash. 533, 107 P. 349 (1910). There, DPL had sold second class tidelands "situate in front of" certain uplands described in state deeds. *Pearl Oyster*, 57 Wash. at 534. At the time of the sale, the legislature had defined tidelands to extend only to the line of mean low tide, but the purchaser claimed ownership below that line. *Pearl Oyster*, 57 Wash. at 534, 537. The court determined that the statutes of the era controlled deed interpretation as to the tide lines and that DPL could not modify those lines fixed by law. *Pearl Oyster*, 57 Wash. at 539. As part of its analysis, the *Pearl Oyster* court reasoned:

> [E]very grant by a sovereign state is construed most strongly against the grantee. Nothing passes by intendment or implication. And if the law or the state deed fixes no limit to a grant, it becomes the duty of the courts to fix the narrowest limit that will reasonably satisfy the terms of the grant.

---

[11] HCSC argues that in *Barlow Point Land Co., LLC. v. Keystone Properties I, LLC*, No. 46080-7, slip op. ( Wash. Ct. App. Sep. 9, 2015) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2046080-7-II%20%20Unpublished%20Opinion.pdf, we previously performed analysis of tideland deeds using extrinsic evidence and asks us to do the same here. However the State was not a party there and neither party argued *Spath* applied.

57 Wash. at 538.

The Reidell tideland deed conveyed "[t]hose portions of the tide lands of the second class and vacated State Oyster Reserve No. 2, Plat No. 137, situate in front of, adjacent to, or abutting upon" her upland parcel. CP at 216. We conclude that the Reidell tideland deed is unambiguous, but that it does not define any lateral boundaries of the tideland parcel. The Reidell tidelands were a grant from the State. The deed fails to define or limit the boundary of the grant. Thus, we interpret the boundary most strongly against the grantee rather than the grantor state. *Davidson*, 116 Wn.2d at 20. Therefore, even if the deed is ambiguous, we resolve the ambiguities in favor of DNR. Accordingly, under *Davidson* and *Pearl Oyster*, the lateral boundaries of the Reidell tidelands are undefined as a matter of law and we need not rely on extrinsic evidence to determine the intent of the grantor and grantee. However, to resolve this case, the trial court must define the lateral boundaries.

B.     *Equitable Apportionment of Tidelands under* Spath v. Larsen

HCSC argues that the trial court erred when it determined *Spath v. Larsen*, 20 Wn.2d at 500, established the legal standards to determine the lateral boundaries of tidelands owned by adjacent owners along a cove or curved shoreline. HCSC argues that *Spath* requires that lateral boundaries of tidelands in a cove *must* be equitably apportioned and is inapt. We disagree. However, we conclude that there are genuine issues of material fact regarding the boundaries of the area to which *Spath* applies.

1. Spath v. Larsen *Applies When Apportioning Tidelands That do not Have Defined Lateral Boundaries in Their Deeds*

In *Spath*, owners of neighboring tidelands in a bay disputed the boundaries between their respective parcels. 20 Wn.2d at 501-02. Neither of the deeds defined the lateral boundaries between the two parcels of tidelands conveyed, each deed stating only that each tideland was "in front of" the abutting upland parcel. *Spath*, 20 Wn.2d at 501-02. The court explained that the shoreline abutting the tidelands was concave "presenting a decided curve, it is apparent that the fixing of the boundary line between the two parcels of tidelands cannot be determined by the simple method employed when the shore line is straight, by erecting a line across the tidelands perpendicular to the meander line." *Spath*, 20 Wn.2d at 502.

Because the question of lateral boundaries along a concave shoreline was a matter of first impression, the *Spath* court set out to "establish certain rules which may serve as guides in similar cases." *Spath*, 20 Wn.2d at 508. First, the court concluded, as a general proposition, that owners of adjoining tidelands have a right to access open water at the line of low tide. *Spath*, 20 Wn.2d at 508. Although the court acknowledged that other elements may be valuable to different tideland owners, it stated that "access to deep water is an important consideration." *Spath*, 20 Wn.2d at 508. The court adopted a rule from Massachusetts which set forth "the fundamental rule, underlying and controlling all others, the flats are to be so divided as to give to each parcel a width at its outer or seaward end proportional to that which it has at high water mark." *Spath*, 20 Wn.2d at 512 (quoting *Wonson v. Wonson*, 14 Allen 71, 96 Mass. 71 (1867)).

Our Supreme Court then laid out the following principles to guide drawing boundary lines along a curved shoreline:

> First: In adjudicating the ownerships of tidelands between adjoining upland owners on a concave shore line, each upland owner is entitled to a proportionate share of the tidelands extending to the low water mark.

> Second: The course or courses of the boundaries of the upland properties should be disregarded, each upland owner being entitled to share ratably in the adjoining tidelands, having regard only to the amount of shore line which he owns, lying between the points where the lateral boundaries of his upland meet the shore line or the government meander line, whichever, in the particular case, constitutes the water boundary of his upland.

> Third: Tidelands should be apportioned between the respective upland owners so that as the whole length of the water boundary of the land within the concave shore, cove or bay, is to the whole length of the low water line, so is each landowner's proportion of the shore line to each owner's share of tidelands along the line of low water. Tidelands may be divided between adjoining owners by erecting lines perpendicular to the general course of shore line only in cases where the shore line is straight, or substantially so.

*Spath*, 20 Wn.2d at 524-25. Here the low water mark is defined as the extreme low tide line.

*See* RCW 79.105.060(18); LAWS OF 1927, ch. 255, § 6; .

Here, as in *Spath*, there are undefined lateral tideland boundaries dividing two owners. The Reidell deed defines the tidelands only as being "in front of" the upland parcel. The shoreline here is curved, bending to the north where the Reidell uplands meet the headlands. The parties cannot agree as to their rights. It is possible to divide each tideland parcel so that each upland owner receives a share of the tidelands along the line of low water proportionate to the width of each upland parcel. Thus, *Spath* applies here and the tidelands should be equitably apportioned accordingly.

Furthermore, contrary to HCSC's argument, nothing in *Spath* says equitable apportionment *must* be applied to all tidelands along curved shorelines. Indeed, *Spath* makes it

26

clear it applies only where parties dispute a boundary that is not defined in the deed and where the parties cannot agree as to their rights. 20 Wn.2d at 502, 525.

HCSC argues that *Spath* does not stand for the proposition that we can ignore extrinsic evidence and equitably apportion tidelands. HCSC cites *Strand v. State*, 16 Wn.2d 107, 119-20, 132 P.2d 1011 (1943), where our Supreme Court relied on extrinsic evidence to ascertain the parties' intent as to tideland boundaries. But *Strand* was decided one year before *Spath* and involved waterward boundaries, not lateral ones. 16 Wn.2d at 113-15. Moreover, *Spath* says nothing about extrinsic evidence; our decision to examine extrinsic evidence turns on our interpretation of the deed in favor of the State under *Davidson* and *Pearl Oyster*.

HCSC also argues that *Spath* does not apply because DNR retains no ownership in the tidelands west of the headlands. But as explained above, the Reidell deed does not fix lateral limits. "And if . . . the state deed fixes no limit to a grant, it becomes the duty of the courts to fix the narrowest limit that will reasonably satisfy the terms of the grant." *Pearl Oyster*, 57 Wash. at 538.

Indeed, as HCSC admits in its brief:

> Tidelands not sold by the State are retained under State ownership. Unlike a private tideland owner, the State does not have a grant deed for its retained tidelands. Rather, its remaining tideland ownership is determined by defining what was sold by the State and subtracting those sold tidelands. The State owns the remainder.

Br. of HCSC at 24 (citing Suppl. CP at 3441). Because the eastern boundary of the Reidell tideland is undefined, and DNR owns the upland parcel to the east, the State owns a remainder in any tidelands between the Reidell tidelands and DNR's upland parcel. However, the exact bounds of the State's remainder tidelands must be determined.

27

2. *There Are Genuine Issues of Material Fact as to the Boundaries of the Area to be Equitably Apportioned*

HCSC argues that the trial court erred when it granted summary judgment to DNR because the parties dispute genuine issues of material fact. HCSC argues that if *Spath* applies, it must be applied in the light of the facts of the particular situation. We agree.

Summary judgment is appropriate only where there is no dispute as to a genuine issue of material fact. *Lakey*, 176 Wn.2d at 922. A genuine issue of material fact exists where reasonable minds could differ on a fact that controls the outcome of the litigation. *Ranger Ins.*, 164 Wn.2d 545.

Here there are genuine issues of material fact as to the "cove" boundaries set in the McEvilly survey. The *Spath* guidelines set out that tidelands should be apportioned along "the whole length of the water boundary of the land within the concave shore, cove or bay." *Spath*, 20 Wn.2d at 524.

As shown in the image in the facts section above, the McEvilly survey set the extreme limits of the tidelands to be apportioned between a Northeasterly Cove Limit running northwest from the headlands and a Westerly Cove Limit on the western extremity of the affected tidelands. This defined the length of the tideland within the concave shore to the west of the headlands. But the Wilson & Thalacker survey states that McEvilly placed these bounds arbitrarily and that those limits must be determined based on "naturally-occurring geologic features." Suppl. CP at 2079. Ferguson also raised doubts as to the accuracy of the McEvilly survey.

28

DNR argues that no party challenged the factual application of proration in McEvilly's survey to establish the tideland boundaries. But DNR admits that "[a]ppellants and their surveyors reject application of *Spath*." Br. of Resp't at 24. The surveyors analyzed the division of the parcels compared to the deeds and physical landmarks. The surveys are therefore a factual application of tideland division. Because the Ferguson and Thalacker & Wilson surveys were proffered by HCSC and Timmerman, and because they show a different application of tideland division, the existence of the two surveys shows the appellants challenged the proration in the McEvilly survey. Indeed, Wilson and Thalacker stated that the cove boundaries McEvilly established at the extreme limits of the prorated area were arbitrary.

Because the record shows that experts disagree on this fact, it follows that reasonable minds could differ as to the amount of land "within the concave shore," depending on where the cove limits are placed.[12] *Spath*, 20 Wn.2d at 524. Any change would affect the way in which the proration would be applied and therefore could change the outcome of the McEvilly apportionment ordered by the trial court. Thus, the accuracy of the McEvilly survey and the easterly and westerly bounds of the area to be apportioned within the concave shore present genuine issues of material fact. Accordingly, summary judgment is not appropriate.

---

[12] Regardless of where the northeasterly bounds of the area within the concave shore are placed, this should not disturb Timmerman's claim to the Murray tidelands. As explained above, the Murray tidelands do not extend all the way to the extreme low tide mark. DNR's tidelands would. Thus, depending on where the finder of fact determines the northeast limit of the concave shore lies, DNR's tideland claim could wrap around the Murray tidelands to the west and north. Indeed, barring the existence of a conflicting deed, the State holds title to the tidelands north of the Murray tidelands to the extreme low tide mark. RCW 79.105.060.

3. *The Trial Court Erred when it Quieted Title to the Upland Parcels.*

HCSC argues that the trial court's determination of the upland boundary was improper, unnecessary, and that the McEvilly survey on which it was based was fatally flawed. Although we agree that the trial court erred when it adopted the upland boundary between the Reidell and DNR uplands from the McEvilly survey, for the reasons explained above, the accuracy of the remainder of the McEvilly survey is a genuine issue of material fact. The trial court's ruling to adopt the upland boundary from the McEvilly survey on summary judgment is in error for several reasons.

First, DNR did not seek to quiet title to the boundary between its parcel and the Reidell parcel now owned by the Iddings family. Under CR 56(c), a trial court shall render summary judgment "if the pleadings . . . together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Thus, an argument not raised in a pleading is not before the trial court. *Ferrin v. Donnellefeld*, 74 Wn.2d 283, 285, 444 P.2d 701(1968); CR 56(c). If a matter was not raised in pleadings before the trial court, we do not consider it on appeal. *Ferrin*, 74 Wn.2d at 285. DNR's answer and counterclaim did not seek to quiet title to any upland parcel. DNR sought only to quiet title to the tidelands. Thus, the upland division was not before the trial court. Although evidence regarding the upland boundary as defined in the McEvilly survey is before us, the issue of quiet title to the upland divisions is not.

Second, DNR argues that to locate the lateral boundaries of the tidelands under *Spath*, McEvilly needed to locate the lateral boundaries of the upland parcel. Although any survey determining the lateral tideland boundaries based on abutting uplands must *locate* the upland

parcel, *Spath* does not stand for the proposition that the divisions between the abutting uplands

are subject to change or that title must be quieted in upland divisions—it applies only to

tidelands.

The *Spath* court explained:

*The course or courses of the boundaries of the upland properties should be disregarded*, each upland owner being entitled to share ratably in the adjoining tidelands, having regard only to the amount of shore line which he owns, lying between the points where the lateral boundaries of his upland meet the shore line or the government meander line, whichever, in the particular case, constitutes the water boundary of his upland.

*Spath*, 20 Wn.2d at 524 (emphasis added). Thus, the McEvilly survey was flawed because it

defined the course of the boundary between the upland parcels. Accordingly, only the *point* on

shore along the government meander line need be determined; the whole of the upland boundary

is not at issue and the trial court need not consider the portion of any survey defining the whole

of the upland boundary. Thus, the trial court erred when it ordered summary judgment to quiet

title to the upland parcel. Because the extent of the uplands boundary was not before the trial

court, we do not reach the remaining issues of deed interpretation as to the upland parcels.

4. *The Trial Court Did Not Err when it Denied HCSC Summary Judgment against DNR*

HCSC argues that it is entitled to summary judgment on its quiet title claim. It again

argues that *Spath* does not apply and that the communications contemporaneous to the Reidell

conveyance establish the boundaries of the tidelands. However, for the reasons explained above,

the State retains an interest in tidelands where there are undefined boundaries and there are

genuine issues of material fact regarding the he boundaries of the concave shoreline to be

apportioned. Accordingly, HCSC is not entitled to summary judgment.

IV. CONCLUSION

The trial court erred when it granted DNR summary judgment as to Timmerman's

tideland parcel because DNR is barred from making any claim to that parcel by res judicata as a

result of the *Margett* litigation. Thus, the trial court erred in denying Timmerman's motion for

summary judgment. Regarding the remaining tidelands, the trial court correctly applied *Spath v.*

*Larsen* in this case because neighboring tideland owners dispute lateral boundaries that are

undefined in any deed along a concave shoreline. However, the trial court erred when it granted

summary judgment to DNR because there are material questions of fact as to the boundaries of

the concave shoreline to be equitably apportioned. For the same reasons, HCSC is not entitled to

summary judgment.

ATTORNEY FEES

DNR argues that it is entitled to attorney fees for defending this appeal. It argues that it

is entitled to fees under RCW 79.02.300(1) because HCSC caused damage or waste to public

lands by taking shellfish from DNR lands and attempting to prevent members of the public from

accessing the spit. We disagree.

We review the award of statutory attorney fees de novo. *Niccum v. Enquist*, 175 Wn.2d

441, 446, 286 P.3d 966 (2012). Typically, there is no basis for fees in an action to quiet title.

*Colwell v. Etzell*, 119 Wn. App. 432, 442, 81 P.3d 895 (2003). But RCW 79.02.300(1) provides,

> Every person who, without authorization, uses or occupies public lands, removes
> any valuable material as defined in RCW 79.02.010 from public lands, or causes
> waste or damage to public lands, or injures publicly owned personal property or
> from public lands, or causes waste or damage to public lands, or injures publicly
> owned personal property or publicly owned improvements to real property on
> public lands, is liable to the state for treble the amount of the damages. . . . In
> addition, the person is liable for reimbursing the state for its reasonable costs

including, but not limited to, its administrative costs, survey costs to the extent they are not included in damages awarded for restoration costs, and its reasonable attorneys' fees and other legal costs.

Here, however, the issues related to DNR's claim for damages are still properly before the trial court. The trial court bifurcated the issues and ruled that the issue of damages was separate from the equitable determination of quiet title. Indeed, only the quiet title issues were before the court on summary judgment, and the trial court stayed any issues that could result in damages pending this appeal. Because RCW 79.02.300 is a statute that describes damages resulting from a factual conclusion that was not reached below, the issue is not properly before us. Accordingly, DNR is not entitled to damages.

We affirm in part, reverse in part, and remand to the trial court for further proceedings consistent with this opinion.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Worswick, J.

We concur:

_____
Lee, C.J.

_____
Sutton, J.

33